1-00-02239-RJW-1 (CHAPTER 11)
1-01-00011A (ADVERSARY NO.)

# IN THE UNITED STATES
# BANKRUPTCY COURT FOR THE
# MIDDLE DISTRICT OF PENNSYLVANIA

---

**IN RE: CCI CONSTRUCTION CO., INC.**
**a/k/a CCI/ORTENZIO COMPANY, INC.**

**Debtor**

---

**CCI CONSTRUCTION CO., INC.**
**a/k/a CCI/ORTENZIO COMPANY, INC.**

**Plaintiff**

**v.**

**ALLFIRST BANK**

**Defendant**

---

## ALLFIRST'S POST-TRIAL BRIEF

---

Lawrence J. Gebhardt
Michael D. Nord
Pennsylvania Bar No. 52486
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202
(410) 752-5830

*Counsel for Allfirst Bank*

# TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

Table of Points and Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iv

I.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  The facts which were established at trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     A.   The cash management facility and the line of credit
          were standard banking products . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

     B.   The cash management facility established a zero balance
          account that was never to hold funds . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

          1.   The cash management account transferred funds at the end of
               each day to pay down the line or into an overnight investment . . . . . . . . 3

          2.   Repayments of CCI'S line of credit were made through
               deposits to the zero balance account . . . . . . . . . . . . . . . . . . . . . . . . . 4

          3.   The CCI cash management account was automated . . . . . . . . . . . . . . . . 4

          4.   CCI encouraged customers to make payments directly to
               the zero balance account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

          5.   A demand promissory note evidenced the repayment obligation
               for the line of credit, but the commitment letter governed
               Allfirst's obligation to advance money . . . . . . . . . . . . . . . . . . . . . . . . 5

          6.   Allfirst contractually relinquished its right of off-set . . . . . . . . . . . . . . 6

     C.   CCI suffers a financial reversal that necessitates a termination
          of the line of credit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

     D.   The three challenged payments repaid the line of credit
          consistent with prior practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

          1.   The application of the February 22, 2000 payment was entirely
               consistent with past practice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

          2.   The line of credit was terminated on February 23, 2000 . . . . . . . . . . . . 10

3.     The application of the February 24 and 25, 2000 payments was entirely consistent with past practice except that the computer had been disengaged and the end of the day transfer was done manually by debit memo ........................ 11

4.     February 26 through 29, 2000 ................................. 12

5.     Exhibit A to this memorandum is a color coded and annotated copy of the February 2000 CCI account statement ................. 12

III.    Law and Argument ..................................................... 13

    A.    The preferential payments are not avoidable ........................... 13

       1.    The debt was incurred in the ordinary course ..................... 14

       2.    The payments were made in the ordinary course ................... 14

           a.    The proper focus is upon how and why the payments were made ........................................ 14

               (i)    A change in the procedure for applying payments after receipt does not make the payments out of the ordinary course ............................... 17

               (ii)   A creditor's knowledge of a debtor's financial situation, declaration of default, or termination of a line of credit not directed at obtaining a payment do not preclude application of the ordinary course of business exception ............... 19

               (iii)  Allfirst did not wrongfully terminate the availability of the revolving line of credit ............ 22

               (iv)  Plaintiffs' expert provided incredible testimony ....... 23

               (v)   The three payments and the returned checks .......... 24

       3.    The payments were made according to ordinary business terms ....... 25

    B.    No set-off occurred ............................................... 30

       1.    A set-off cannot also be a preference ........................... 30

2.  Allfirst withdrew the money pursuant to the cash management
    agreement and did not effect a common law offset . . . . . . . . . . . . . . . . . 31

    (i)     Under federal law, Allfirst did not set-off the account . . . . . . . . 32

    (ii)    Allfirst contractually waived the right to offset
            the account . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

    (iii)   The exercise of a contractual right to funds in an
            account is not a set-off . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

IV.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# TABLE OF POINTS AND AUTHORITIES

**CASES**                                                                                                    **PAGE(S)**

*In re 4-S Corp.,*
    69 B.R. 499 (Bankr. W.D. Mo. S. Div. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Allfirst Bank v. Ortenzio,*
    No. 1:CV-0786, slip op. (Bankr. M.D. Pa. Apr. 14, 2003) . . . . . . . . . . . . . . . . . . . . 11, 23

*Apple Computer, Inc. v. Franklin Computer Corp.,*
    714 F.2d 1240 (3d Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*In re Cabrillo,*
    101 B.R. 443 (Bankr. E.D. Pa. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Carnell Constr. Corp.,*
    424 F.2d 296 (3d Cir. 1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*In re Cherrydale Farms, Inc.,*
    No. 99-597, 2001 WL 1820323 (Bankr. D. Del. Feb. 20, 2001) . . . . . . . . . . . . . . . . . . 28

*Citizens Bank of Md. v. Strumpf,*
    516 U.S. 16 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*In re Feiler,*
    218 B.R. 957, 961 (Bankr. N.D. Cal. S.F. Div. 1998),
    *aff'd,* 230 B.R. 164 (B.A.P. 9th Cir. 1999),
    *aff'd,* 218 F.3d 948 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19

*In re First Jersey Secs., Inc.,*
    180 F.3d 504 (3d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*In re Global Tissue, L.L.C.,*
    106 Fed. Appx. 99, 2004 WL 1510091 (3d Cir. July 7, 2004) . . . . . . . . . . . . . . . . . . . 28

*In re Grand Chevrolet, Inc.,*
    25 F.3d 728 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Graphic Prods. Corp.,*
    176 B.R. 65 (Bankr. S.D. Fla. Miami Div. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

iii

**CASES**                                         **PAGE(S)**

*In re Haase,*
    224 B.R. 673 (Bankr. C.D. Ill. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*In re Healthco Int'l, Inc.,*
    132 F.3d 104 (1st Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Hostetter v. Giffin,*
    268 Pa. 530, 112 A. 150 (1920) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.,*
    891 F.2d 66 (3d Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 17, 22

*Lee v. Schweiker,*
    739 F.2d 870 (3d Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Loader Leasing Corp. v. Kearns,*
    83 F.R.D. 202 (W.D. Pa. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*In re Logan Square E.,*
    254 B.R. 850 (Bankr. E.D. Pa. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*In re Magic Circle Energy Corp.,*
    64 B.R. 269 (Bankr. W.D. Okla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 21

*In re Messia,*
    184 B.R. 176 (Bankr. D. Mass. E. Div. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 5, 19

*In re Molded Acoustical Prods., Inc.,*
    18 F.3d 217 (3d Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

*In re Oliver's Stores, Inc.,*
    Civil Action No. 90-381,
    1990 U.S. Dist. LEXIS 15417 (D.N.J. June 4, 1990) . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Pa. Nat'l Bank & Trust Co. v. CCNB Bank, N.A.,*
    446 Pa. Super. 625, 667 A.2d 1151 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*Pittsburgh Nat'l Bank v. United States,*
    498 F. Supp. 101 (W.D. Pa. 1980),
    *aff'd,* 657 F.2d 36 (3d Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

iv

**CASES**                                                                         **PAGE(S)**

*In re R.M.L., Inc.*,
  195 B.R. 602 (Bankr. M.D. Pa. 1996) ..................................... 16, 27

In re Richardson,
  94 B.R. 56 (Bankr. E.D. Pa. 1988) ......................................... 16

*In re Roblin Indus., Inc.*,
  78 F.3d 30 (2d Cir. 1996) ................................................. 21, 27

*In re Schwinn Bicycle Co.*,
  205 B.R. 557 (Bankr. N.D. Ill. E. Div. 1997) ............................... 27

*In re Sims Office Supply, Inc.*,
  94 B.R. 744 (Bankr. M.D. Fla. Orlando Div. 1988) ........................... 20

*Smith v. Mark Twain Nat'l Bank*,
  805 F.2d 278 (8th Cir. 1986) .............................................. 33, 34

*Smith v. Stricker*,
  126 Pa. Super. Ct. 181, 186 A. 369 (1936) ................................. 33

*In re Spada*,
  903 F.2d 971 (3d Cir. 1990) ............................................... 24, 25

*In re Spirit Holding Co.*,
  214 B.R. 891 (E.D. Mo. E. Div. 1997),
  *aff'd*, 153 F.3d 902 (8th Cir. 1998) ..................................... 27

*In re Tolona Pizza Prods. Corp.*,
  3 F.3d 1029 (7th Cir. 1993) ............................................... 26

*In re U.S.A. Inns of Eureka Springs, Ark., Inc.*,
  9 F.3d 680 (8th Cir. 1993) ................................................ 26, 28

*Union Bank v. Wolas*,
  502 U.S. 151 (1991) ....................................................... 13

*In re Wallaert*,
  149 B.R. 665 (Bankr. W.D. Wash. 1992) ..................................... 15, 19

**CASES**                                                          **PAGE(S)**

*In re Yurika Foods Corp.*,
        888 F.2d 42 (6th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16


**STATUTES**

11 U.S.C.A. § 101(54) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

11 U.S.C.A. § 362 (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

11 U.S.C.A. § 363 (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

11 U.S.C.A. § 547 (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 31

11 U.S.C.A. § 547(b) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

11 U.S.C.A. § 547(c)(1) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 24

11 U.S.C.A. § 547(c)(2) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*

11 U.S.C.A. § 547(c)(2)(B) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

11 U.S.C.A. § 547(c)(3) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

11 U.S.C.A. § 553 (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

11 U.S.C.A. § 553(a) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

11 U.S.C.A. § 553(b) (West 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . *passim*


**TREATISES**

Barkley Clark & Barbara Clark,
        1 *The Law of Secured Transactions under the Uniform Commercial Code*
        ¶ 1.08[9][d][i] (rev. ed. May 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

William L. Norton, Jr.,
        3 *Norton Bankruptcy Law and Practice 2d*
        § 57.19 (Mar. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Case 1:01-ap-00011-JJT    Doc 80    Filed 05/03/05    Entered 05/05/05 07:59:51    Desc
Main Document    Page 8 of 61

# POST TRIAL BRIEF OF MANUFACTURERS AND TRADERS TRUST COMPANY

## I.
## Introduction.

On each of February 22, 24, and 25, 2000, a customer of CCI Construction Co., Inc. made a payment to CCI by ACH transfer to CCI's account at Allfirst Bank. In accordance with its cash management contract, Allfirst applied the three payments to the outstanding balance of CCI's revolving line of credit at the end of the day. The ACH transfers represented a common payment mechanism used by many of CCI's customers over the years. The application of the net balance in the CCI account at the end of the day to the amount outstanding on the CCI revolving line of credit was a customary and contractually mandated event that had been performed for years. Allfirst did nothing to obtain the payments that reduced the line of credit.

The three payments were preferential transfers under the terms of § 547 of the United States Bankruptcy Code, but they were not avoidable transfers. The three preferential transfers are exempt from avoidance under the ordinary course of business exception of § 547(c)(2) of the Bankruptcy Code.

The application of the funds in the CCI account at the end of each day was not a set-off proscribed under § 547 of the Bankruptcy Code. The application of the three payments to CCI's debt involved preferential transfers, either from CCI's customers or from CCI, to Allfirst. A preferential transfer cannot be a set-off within the contemplation of § 547 of the Bankruptcy Code. And, the three payments were applied pursuant to the cash management agreement and not Allfirst's common law right of offset.

Based upon the facts proven at trial and the applicable law, judgment should be rendered in favor of Allfirst (or, as it is now known, Manufactures and Traders Trust Company). This Post Trial

Brief is submitted in support of that result.

**II.**

**The facts which were established at Trial.**

**A.    The cash management facility and the line of credit were standard banking products.**

As early as 1992, Allfirst (then known as Dauphin Deposit, a predecessor bank) established for CCI an unsecured revolving line of credit and a cash management facility. This revolving line of credit and cash management facility were renewed annually and remained in place until February of 2000, when the revolving line of credit was terminated by Allfirst. Def. Exs.1, 2, 4 (A-F), 5(A and B), 12; Tr. Vol. 1. 22, 45-46.

CCI used the line of credit to fund its day to day working capital needs. The borrowings by CCI under the line of credit were incurred in the ordinary course of its business as a construction company and in the ordinary course of Allfirst' business as a commercial bank. Tr. Vol. 1. 4-5 (Stipulation). The line of credit and cash management facility were extended in accordance with and were governed by terms and conditions and functioned under procedures that were standard in the banking industry and were similar to what Allfirst's competitors offered in the market. The repayment terms and procedures set forth in the loan documents reflected ordinary business terms standard in the banking industry. Allfirst administered and applied the loan documents in a manner consistent with ordinary business terms. Tr. Vol. 1. 130; Tr. Vol. 2. 113-129.

2

### B. The cash management facility established a zero balance account that was never to hold funds.

#### 1. The cash management account transferred funds at the end of each day to pay down the line or into an overnight investment.

The cash management facility established a zero balance account that worked in the following manner. On each day, any funds that were deposited in CCI's account that day, together with the opening balance in the account, would be used to pay checks that were presented that day. To the extent more funds were on deposit each day than were required to pay items presented for payment that day, an excess balance would be created. This excess balance would be transferred at the day's end either into an overnight investment with a third party that would earn interest (such as a repurchase agreement or similar instrument) or to reduce the outstanding balance on the revolving line of credit. Def. Ex. 2 (¶ 2). Because of the workings of the cash management facility, no positive balance ever would exist in the account as of the close of business each day. The account was what is generally known as a zero balance account (i.e. an account that was not a deposit account due to the lack of any possible positive balance). Tr. Vol. 1. 90-91. Except for a temporary period each day, Allfirst never held CCI funds, which at day's end either would be applied to reduce the balance on the line of credit or to acquire from a third party a repurchase agreement or other interest bearing investment. Through this procedure, CCI would maximize its interest return on positive balances and minimize its interest expense on borrowings under the line of credit. Tr. Vol. 1. 90-91.

To the extent there were not sufficient funds in the account at the end of each day to cover checks presented for payment that day, there would be an advance on the line of credit to cover the shortfall. Def. Ex. 2 (¶ 2). If CCI had an outstanding balance on the line of credit at the start of a day (and, accordingly, a zero deposit balance in the account), the amount of deposits that day would

3

be used to pay checks presented that day. If there were more in checks than deposits, the line of credit would be accessed to make up the difference. Conversely, if the deposits exceeded the checks that day, the excess of the deposits would at the end of the day be applied to the balance owed on the line of credit and, once the line was repaid, to an overnight investment. Def. Ex. 2 (¶ 2); Tr. Vol. 1. 90-91; Tr. Vol. 2. 6.

**2. Repayments of CCI's line of credit were made through deposits to the zero balance account.**

Due to the workings of the cash management facility and the zero deposit character of the account, repayments of the line of credit could only come from deposits to the account. Tr. Vol. 1. 94. If CCI had an outstanding balance on its line of credit, it could only reduce that balance through deposits made to the account, which would be applied at the end of the day to reduce the line of credit. Tr. Vol. 1. 68, 94; Tr. Vol. 2. 10, 61.

In addition to its regular account, CCI had a subsidiary payroll account that also was maintained as a zero balance account and which drew its funds by electronic transfers from the main account. When checks from the payroll account were presented for payment, there would be an electronic transfer from the regular account to the payroll account under the above described procedures to cover the aggregate amount of the presented payroll checks. Def. Ex. 10A; Tr. Vol. 1. 105-6; Tr. Vol. 2. 44.

**3. The CCI cash management account was automated.**

At least as of 1999 and most likely long before, the procedures described above were fully automated. Tr. Vol. 2. 32. The sweeps of positive balances at the end of each day (either to an overnight investment or to reduce the line of credit) and the advance of any necessary funds from

4

the line of credit were controlled by the Allfirst computer and were done automatically. Repayments on the line of credit were accomplished by deposits into the account. Tr. Vol. 1. 97-8.

### 4. CCI encouraged customers to make payments directly to the zero balance account.

To maximize the benefits of the cash management facility, CCI arranged for many of its customers to deposit directly (usually by ACH transfer) into CCI's account at Allfirst all payments on CCI billings. CCI attempted to have as many of its customers as possible make direct deposits into its Allfirst account. Tr. Vol. 1. 2, 7-8. As of the beginning of 2000, a number of CCI's customers were making direct deposits of their payments to CCI in its account at Allfirst. Tr. Vol. 1. 67, 91-92. These deposits from customers reduced any balances on the revolving line of credit under the cash management procedures that have been described and reflected the typical way in which the line of credit was repaid.

### 5. A demand promissory note evidenced the repayment obligation for the line of credit, but the commitment letter governed Allfirst's obligation to advance money.

The repayment obligation of the revolving line of credit was evidenced by a "Film Solutions Promissory Note (Pennsylvania)." Def. Ex. 2. This promissory was a demand note and authorized Allfirst to demand full payment of the revolving line of credit whether or not a default had occurred. Def. Ex. 2; Tr. Vol. 1. 89, 102. The promissory note also specified that no further advances would be made on the revolving line of credit if there either was a demand for payment or if there was a default. Def. Ex. 2 (¶ 12); Tr. Vol. 1. 102-3.

The promissory note contained a specific section providing the terms and procedures applicable to the cash management facility. Def. Ex. 2 (¶ 2). On the other hand, a commitment letter

5

dated March 24, 1999 provided the terms and conditions upon which the line of credit would be available to CCI, including various covenants and reporting requirements. Def. Ex. 1; Tr. Vol. 1. 104-5. The commitment letter expressly stated that it was to survive execution of the loan documents. The commitment letter, consistent with commitment letters going back to at least 1993, specified that the revolving line of credit was on a demand basis. Def. Exs.1, 4 (A-F); Tr. Vol. 1. 95. The commitment letter, like its predecessors, authorized Allfirst to terminate the line of credit and its availability at any time for any reason. Def. Exs. 1, 4(A-F); Tr. Vol. 1. 89, 95-97. The commitment letter did not require CCI to be in default for Allfirst to withdraw the line of credit and to refuse to make further advances. Def. Ex. 1.

6.    **Allfirst contractually relinquished its right of off-set.**

Several provisions, including provisions specifying that the account was pledged to Allfirst and confirming Allfirst's right of set-off, were stricken from the promissory note by Sherri Phillips, CCI's chief financial officer. Def. Ex. 2; Tr. Vol. 2. 13. John Ortenzio, CCI's president, testified that he approved the changes made by Phillips. Tr. Vol. 1. 59, 65-66. Phillips testified that she negotiated these provisions with Craig Schwartz, the Allfirst loan officer, and obtained his authorization to make the changes. Tr. Vol. 2. 17-18. Schwartz did not remember speaking to Phillips about the stricken portions, which bore Phillips' initials but not those of Schwartz. Tr. Vol. 1. 101. Despite the contradictory testimony, Allfirst did accept the promissory note with the cross outs, and the parties operated under this promissory note until the loan was called. Tr. Vol. 1. 102.

If the strikeouts were effective, Allfirst contractually waived its right to offset the account. If the strikeouts were not effective, CCI pledged the account to Allfirst.

6

### C. CCI suffers a financial reversal that necessitates a termination of the line of credit.

On Friday, February 18, 2000, Ortenzio called a meeting with representatives of Allfirst. Tr. Vol. 1. 106; Tr. Vol. 2. 23-4. In this meeting, he revealed a dramatic reversal of CCI's financial situation. He told Allfirst that CCI projected a cash flow shortfall over the next few months of approximately $6 million and provided a financial statement showing that as a result of approximately $6 million in losses in fiscal year 1999, CCI was insolvent by almost $1 million. Tr. Vol. 1. 108-110; Tr. Vol. 2. 25-8; Def. Exs. 7, 8, 9.

At the meeting, Ortenzio represented that CCI had not been paying its subcontractors and promised to write no checks until after he had met with St Paul, the bonding company, on Tuesday of the next week. Tr. Vol. 1. 110; Tr. Vol. 2. 25-6. Ortenzio explained that he was looking for financial support for CCI from its bonding company. Tr. Vol. 1. 111; Tr. Vol. 2. 28.

Despite Ortenzio's representation and promise, he had written checks to subcontractors and wrote checks to CCI subcontractors on Monday, February 21, 2000. Tr. Vol. 2. 10-12. These checks began hitting the Allfirst account on Tuesday, February 22, 2000. Allfirst paid all of the checks presented for payment on Tuesday, February 22, 2000. Def. Ex. 10(A); Tr. Vol. 2. 31-32.

After receiving CCI's distressing news and being presented with a swarm of checks on Tuesday that Ortenzio falsely stated had not and would not be written, Allfirst orally notified CCI on Wednesday, February 23, 2000 that it was terminating the availability of the revolving line of credit as of that day. Tr. Vol. 1. 35, 38. The termination was authorized by the terms of the commitment letter. Def. Ex. 1. On Thursday, February 24, 2000, Allfirst by letter declared CCI in default and demanded immediate payment from CCI. Def. Ex. 12. The letter confirmed Allfirst's

7

termination of the revolving line of credit, a termination as to which CCI had been orally advised the preceding day.

With an exception to be hereafter described, Allfirst made no further advances under the revolving line of credit as of February 23, 2000 and began returning checks drawn against the line of credit. Def. Ex. 10(A). Allfirst did honor checks presented for payment against the payroll account after February 23, 2000 and through month's end. Funds to honor these checks were electronically transferred to the payroll account. The money to pay the payroll checks was treated as an overdraft of the account rather than an advance on the line of credit. The overdraft resulted in a negative leger balance on CCI's account statement. Def. Ex. 10(A). Allfirst did not terminate the cash management facility or close CCI's account. Def. Ex. 10(A); Tr. Vol. 1. 66-67.

**D.     The three challenged payments repaid the line of credit consistent with prior practice.**

On February 22, 24, and 25, 2000, three preferential payments were made to Allfirst through deposits into the CCI account. Def. Ex. 10(A). These deposits did not come from CCI. Rather, they were ACH wire transfers unilaterally sent by customers of CCI in accordance with the payment procedures CCI had established with these customers long before CCI's financial problems were disclosed to Allfirst. Tr. Vol. 1. 112, 114-6. Allfirst did absolutely nothing to obtain these payments and was entirely unaware that the payments were being made until the money appeared in the account from the ACH transfers.

The funds deposited in the account were transferred at the end of the day pursuant to the cash management procedures described in the promissory note. Def. Ex. 10(A); Tr. Vol. 1. 115. The balance of one of the deposits left after paying that day's presented checks and a payroll account

8

transfer and the entire amount of the other two deposits, subject to payroll account advances on each of the days, were applied at the end of the day to reduce the balance of the line of credit that was outstanding. In making the transfer at the end of the day, Allfirst acted pursuant to the cash management contract. Tr. Vol. 1. 115. Allfirst did not intend to exercise its common law right to offset deposit accounts against sums owed to it. Tr. Vol. 1. 115-6; Tr. Vol. 2. 42.

1. **The application of the February 22, 2000 payment was entirely consistent with past practice.**

Allfirst received an ACH transfer from a CCI customer of $634,066.54 on Tuesday, February 22, 2000. Def. 10(A). At the time this deposit was received, Allfirst had not as yet terminated the line of credit. The cash management facility was subject to the full automated procedures on this date and operated as it always had. Tr. Vol. 1. 112-3; Tr. Vol. 2. 31-32.

There were $123,225.70 in checks presented for payment on February 22, 2000. Each of these checks was paid from the $634,066.54 deposit. In addition, there was a $10,035.35 transfer to the payroll account to cover payroll checks. At the end of the day, the balance - $510,840.84 - was automatically swept from the account and applied to the outstanding balance due on the line of credit. Def. Ex. 10(A); Tr. Vol. 2. 31-2.

The treatment of the deposit, the checks presented for payment, and the electronic payroll account transfer were identical, in substance, to what had occurred during the preceding nine years. The automated system was fully engaged and accomplished the transactions. CCI's account statement reflects the receipt of the ACH deposit, the payment of all presented checks, the payroll account electronic transfer, and the "sweep" transfer of the balance of the deposit from the account to bring the account to a zero balance. Tr. Vol. 1. 112-3.

9

## 2. The line of credit was terminated on February 23, 2000.

On Wednesday, February 23, 2000, Allfirst notified CCI that the line of credit was terminated and that it would no longer advance funds to CCI. Tr. Vol. 1. 114; Tr. Vol. 2. 35-8. The automated procedures were disengaged from the facility, which was placed under manual control. Tr. Vol. 2. 38-9. Allfirst removed the automated procedures and imposed manual controls to prevent unintended advances under the line of credit from occurring after CCI's right to access the line had been terminated. Tr. Vol. 2. 38-9.

No deposits were received on February 23, 2000. The Internal Revenue Service, however, attempted to effect an electronic debit transfer of funds from CCI's account to cover taxes due. Because there were no funds in the account and because Allfirst would no longer advance under the line, the automatic transfer of funds to the Internal Revenue Service was rejected and was not paid. It was recorded as an "ACH Debit Reversal -NSF" the next day, similar to the way in which NSF dishonored checks were treated. Tr. Vol. 2. 48. Despite Plaintiffs' contrary (and somewhat fanciful) assertion, this attempted wire transfer was never made; it was not reversed. Allfirst did not send the money to the Internal Revenue Service on February 23 and then, after the money was in hand at the Internal Revenue Service, take it back and away from the taxing authority on February 24, 2000. Payment was simply refused due to the zero balance in the account and lack of access to the line. No money was ever sent. Def. Ex. 10(A).

Allfirst did, however, cover checks presented against the payroll account on this date. The sum of $21,042.22 was transferred from the main account to the payroll account via an advance on the line of credit. Def. Ex. 10(A).

10

3.   **The application of the February 24 and 25, 2000 payments was entirely consistent with past practice except that the computer had been disengaged and the end of the day transfer was done manually by debit memo.**

On February 24, and 25, 2000 (Thursday and Friday), Allfirst received deposits in the account from CCI customers by ACH transfer of $638,911.65 and $1,167,539, respectively. Def. Ex. 10(A). Tr. Vol. 1. 114-117. On these two days, Allfirst was presented for payment checks aggregating $417,000. The checks were returned unpaid. The deposits were swept from the account at the end of each day and applied to reduce the balance of the revolving line of credit in accordance with the cash management provisions of the promissory note and in accordance with the practice that had been in effect over the many years in which the revolving line of credit\cash management facility was in place. Def. Ex. 10(A), 5 (A and B). Because of the deactivation of the automated feature and the imposition of a manual control, the February 24 and February 25 deposits were swept by way of a "debit memo." Although done manually, the debit memos simply accomplished the same overnight transfer which would have occurred and replicated what would have happened if the automated aspect were still in effect for deposits. Def. Ex. 10(A); Tr. Vol. 1. 114-117; Tr. Vol. 2. 40-1.

Allfirst had used debit memos in the past on CCI's account. Def. Ex. 11 (A-E); Tr. Vol. 2. 59-60. For example, a debit memo was used by Allfirst on February 15, 2003 to pay the interest due on the $1.2 million short term loan that Ortenzio fraudulently caused CCI to repay to escape liability on his guaranty. Def. Ex. 10(A); Tr. Vol. 1. 100; Tr. Vol. 2. 56-7. *See Allfirst Bank v. Ortenzio*, No. 1:CV-0786, slip op. (M.D. Pa. Apr. 14, 2003) (providing background facts) The use of debit memos to transfer money out of an account was a standard practice in the banking industry; the term "debit

11

memo" was common in banking jargon. Tr. Vol. 1. 98; Tr. Vol. 2. 57, 124. Allfirst used the February 24 and 25 debit memos because the account was not subject to the control of the automated process and the only way to effect the end of the day transfer pursuant to the cash management agreement was manually via a debit memo. Tr. Vol. 1. 115.

Allfirst did, however, fund $8,759.03 on February 24, and $65,817.54 on February 25, 2000 to the payroll account to cover checks presented on these days. Although the total deposits received on these two days reduced the line of credit, these payroll account advances were funded as overdrafts creating a negative leger balance indebtedness that was additional to what was owed on the line. Def. Ex. 10(A); Tr. Vol. 1. 117, Tr. Vol. 2. 50, 52, 54, 91-3.

4.      **February 26 through 29, 2000.**

There were no deposits after the February 25 ACH transfer. Checks, in the aggregate amount of $310,958.64, were presented for payment between February 26, and February 29, 2000. Because there were no funds on deposits and because the line of credit was not available to fund a payment, Allfirst returned the checks unpaid. Def. Ex. 10(A). The checks were reflected on CCI's account statement with the designation "Debit Reversal NSF" to indicate that the checks had not been paid because of non-sufficient funds. Def. Ex. 10(A).

Allfirst did, however, advance $15,820.26,and $19,132.92 to the payroll account on February 28 and 29, 2000, respectively. Def. Ex.10(A).

5.      **Exhibit A to this memorandum is a color coded and annotated copy of the February 2000 CCI account statement.**

Allfirst has attached as Exhibit A to this Memorandum the February, 2000 account statement of CCI, consisting of 15 pages and reflecting the account activity for the month of February. This

12

document is annotated and color coded to explain the transactions recorded thereon. Exhibit A is based upon Defendant's Exhibits 10 (A and B) and the testimony of Jamin Gibson. Tr. Vol. 2. 43 - 57.

### III.
### Law and Argument.

**A.     The preferential payments are not avoidable.**

The three payments that were made on February 22, 24, and 25, 2000 were preferential under § 547 of the Bankruptcy Code. Each payment represented a transfer, as defined in § 101(54) of the Bankruptcy Code, within 90 days of the May 19, 2000, Chapter 11 petition at a time when CCI was insolvent.

Although preferential, the payments were not avoidable preferences. Section 547(c)(2) of the Bankruptcy Code exempts from avoidance preferential payments made in the ordinary course of business. *Union Bank v. Wolas*, 502 U.S. 151, 162 (1991) (Payments on both long- and short-term debt can qualify under ordinary course of business exception.). Section 547(c)(2) has three components that the recipient of the preferential payment must establish to make the payments unavoidable. *In re J.P. Fyfe, Inc. of Fla. v. Bradco Supply Corp.*, 891 F.2d 66, 69-70 (3d Cir. 1989). For a preferential payment to be unavoidable, the preferential payment must have been made (1) with respect to a "debt incurred [by the debtor] in the ordinary course of business [or financial affairs] of the debtor and the transferee," (2) "made in the ordinary course of business or financial affairs of the debtor and the transferee" and (3) "made according to ordinary business terms." *Id.* (citations omitted). Allfirst established through its evidence each of the three elements required by § 547(c)(2).

13

1. **The debt was incurred in the ordinary course.**

There is no dispute that the amount owed by CCI to Allfirst on the line of credit was a debt incurred in the ordinary course of business of both the debtor and the transferee.

2. **The payments were made in the ordinary course.**

   a. **The proper focus is upon how and why the payments were made.**

The second prong of § 547(c)(2) requires that the preferential payment (i.e. the transfer) be made in the ordinary course of business between debtor and creditor and looks to the subjective aspects of the dealings between debtor and creditor. *In re First Jersey Secs., Inc.*, 180 F.3d 504 (3d Cir. 1999). The focus is upon the mechanism and surrounding circumstances by which the payment went from debtor to creditor (*i.e.*, the transfer, within the meaning of Bankruptcy Code § 101(54)) and how this mechanism and these surrounding circumstances compare to their antecedents in the dealings between the debtor and the creditor. The focus is not upon what the creditor did with the payment once it was in hand (which is not a transfer under § 101(54)), how the creditor recorded the payment or procedurally applied the payment upon its receipt, or whether the creditor was extending credit in the same manner as always at the time it received the payment. CCI (or more properly, its customers) made the transfer to Allfirst in the ordinary course of its business and financial affairs. The timing, amount, and manner of the flow of funds to Allfirst was the same as occurred in the past dealings.

That the proper emphasis lies upon how and why the payment was made is evident in the language of the Bankruptcy Code. Under the exception of § 547(c)(2), a "transfer" must be made in the ordinary course. Under § 101(54), a transfer is defined as a conveyance of property by any

14

means. Implicit in the definition is the concept that the property go from one person to another. *In re Messia*, 184 B.R. 176, 177 (Bankr. D. Mass. E. Div. 1995) (Inherent in the quoted definitions is a requirement that a 'transfer' include the acquisition of an interest by a third party."); *see also In re Feiler*, 218 B.R. 957, 961 (Bankr. N.D. Cal. S.F. Div. 1998), *aff'd*, 230 B.R. 164 (B.A.P. 9th Cir. 1999), *aff'd*, 218 F.3d 948 (9th Cir. 2000) ("The crux of the definition is that the transferor no longer has the same rights that the transferor had prior to the transfer."); *In re Wallaert*, 149 B.R. 665, 668 (Bankr. W.D. Wash. 1992) ("Section 101(54) does not speak in terms of an effect on creditors: rather, it focuses on what, if anything, the debtor parted with."). CCI's customers, with CCI's full authorization, transferred the funds to Allfirst. Upon receipt by Allfirst, CCI lost its rights in the funds due to the outstanding balance on the line of credit and the end of the day transfer specified in the cash management agreement.

This interpretation is supported by decisions analyzing what factors determine whether a transfer is in the ordinary course of business of the debtor and the creditor. These decisions direct the inquiry to the circumstances and procedures involved in the making of the payment by the debtor- not to what the creditor did with the payment once it was in hand or to the amount of credit the creditor was making available on the day the payment was received. In *J.P. Fyfe*, 891 F.2d 66, the Third Circuit, describing what the second prong requires, stated: "Second, the creditor must show that **the debtor made the transfer** in the ordinary course of business or financial affairs of the debtor and the transferee." *Id.* at 69-70 (emphasis added). In a later decision citing *J.P. Fyfe,* the Third Circuit expanded on the focus of the inquiry by stating that, in determining whether the transfer was ordinary between the debtor and creditor, "[f]actors such as timing, the amount and manner in which a transaction was paid are considered relevant." *First Jersey*, 180 F.3d at 512

15

(citation omitted).

In *In re Grand Chevrolet, Inc.*, 25 F.3d 728 (9th Cir. 1994), the Ninth Circuit described what were appropriate points of inquiry in determining whether payments made by the debtor were made in the ordinary course under § 547(c)(2)(B) of the Bankruptcy Code. The points of inquiry are directed to how and the why the payment was made, not to how the creditor treated the payment upon its receipt. In *Grand Chevrolet*, the Ninth Circuit wrote:

> Among the factors courts consider in determining whether transfers are ordinary in relation to past practices are: 1) the length of time the parties were engaged in the transactions at issue; 2) whether the amount or form of tender differed from past practices; 3) whether the debtor or creditor engaged in any unusual collection or payment activity; and 4) whether the creditor took advantage of the debtor's deteriorating financial condition.

*Id.*, 25 F.3d at 732 (citation omitted); *see also In re Healthco Int'l, Inc.*, 132 F.3d 104, 109 (1st Cir. 1997) ("These factors include the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was effected."); *In re Yurika Foods Corp.*, 888 F.2d 42, 45 (6th Cir. 1989) ("In considering which transactions are ordinary, courts examine several factors, including timing, the amount and manner a transaction was paid and the circumstances under which the transfer was made." (Citation omitted).); *In re Logan Square E.*, 254 B.R. 850 (Bankr. E.D. Pa. 2000); *In re R.M.L. Inc.*, 195 B.R. 602 (Bankr. M.D. Pa. 1996); *In re Richardson*, 94 B.R. 56 (Bankr. E.D. Pa. 1988). As one Bankruptcy Court observed: "The issue under § 547(c)(2) is whether the transfer in question was made in **a similar manner** to the parties' transactions prior to the preference period." *In re Graphic Prods. Corp.*, 176 B.R. 65, 70 (Bankr. S.D. Fla. Miami Div. 1994) (emphasis added). It is not necessary that the circumstances of the challenged payment be exact in all respect with prior

16

payments but only that there be "'**some consistency** with other business transactions between the debtor and the creditor.'" *In re Magic Circle Energy Corp.*, 64 B.R. 269, 272 (Bankr. W.D. Okla. 1986) (emphasis added) (quotation omitted).

When one focuses upon how the payments were made by CCI (or, more properly, its customers on behalf of CCI) - how and under what circumstances did the payments go from CCI to Allfirst - it becomes clear that the three payments were made in the ordinary course of business between CCI and Allfirst. The three payments were made in exactly the manner as had occurred over many years. Before there was any issue of CCI's solvency or its financial viability, CCI had requested customers to make payments on CCI invoices directly to the account at Allfirst. This is exactly what occurred with each of the three challenged payments. Allfirst had no part or involvement in the making of the payments by the customers. It made no demand or even a request for the payments. The payments simply arrived at Allfirst for crediting to CCI's account, as had most all other payments over the course of Allfirst's business dealings with CCI. There was nothing to distinguish these payments from the payments which had been made over the nine year history of the dealings of CCI and Allfirst. *See generally J.P. Fyfe*, 891 F.2d 66.

> (i) **A change in the procedure for applying payments after receipt does not make the payments out of the ordinary course.**

Plaintiffs argue that Allfirst's use of a manual debit memo to transfer two of the three payments prevented these two payments from qualifying as ordinary course. Customarily, payments were transferred to reduce the line of credit by an automated procedure controlled by computer and designated a "Sweep Loan Payment" on CCI's account statements. The net amount of the first payment on February 22 was applied in this manner. Because the line was terminated, Allfirst

17

removed the account from the computer to prevent unintended automatic advances on the line of credit. This necessitated the use of a manual "debit memo" to apply the payments received on February 24 and 25. Plaintiffs contend that applying the payments manually, rather than by an automated procedure, negates any possible application of the ordinary course of business exception. Plaintiffs make this argument even though the debit memo procedure had been used previously to transfer funds out of CCI's account, as occurred on February 15, 2000.

The transfer of the account balance at the end of the day to reduce the line of credit was entirely consistent with what had been done over the years the cash management facility was in place. The only distinction, focused upon by CCI, is that two of the payments were swept manually and only one by the automated mechanism in place prior to the termination of the revolving credit line of credit. The sweep transfer, both the two manual and the one automated, resulted in the same end result as would have occurred at any time during the nine year history of the party's dealings and as would have occurred if the revolving line of credit was still in place. The transfer of the deposits via the manual and the automated sweeps applied the money exactly as it always would have been applied - to the reduction of the balance on the line of credit if one existed. *See In re Haase*, 224 B.R. 673, 674 (Bankr. C.D. Ill. 1998) (The lender took the entire balance of the debtor's account rather than the installment payment that was due and the Court observed: "If the transfer had been only of a portion of the deposit account, in the amount of a normal payment on the revolving loan, it may have qualified.").

Plaintiffs argument cannot survive a confrontation with the definition of transfer in Bankruptcy Code § 101(54). The definition of transfer in the Bankruptcy Code requires property or an interest in property to move from one person to another. The definition will not tolerate a transfer

18

by one person to itself. *Messia,* 184 B.R. 176; *Feiler,* 218 B.R. 957; *Wallaert,* 149 B.R. 665. The transfer occurs when payments go from the debtor to the creditor – not when the creditor applies what has been received.

There is no case authority that looks to the procedure used to apply the payments received in analyzing whether the ordinary course exception applies. There is no precedent saying that a change in the procedure for applying payments after the payments have been received justifies barring the creditor from the safe harbor of § 547(c)(2). Certainly, the slim reed of a change in procedure from automated to manual that results in the same application of the received payment to the debt would not support creating such a precedent.

> (ii) **A creditor's knowledge of a debtor's financial situation, declaration of default, or termination of a line of credit not directed at obtaining a payment do not preclude application of the ordinary course of business exception.**

Rather than address how the payments were made, Plaintiffs attempt to obscure the inquiry from its correct focus. Plaintiffs concentrate upon Allfirst's actions that were unrelated to bringing the payments into the bank. In pursuit of this misdirection, Plaintiffs argue that Allfirst had knowledge of CCI's financial condition, and armed with this knowledge, refused to permit further advances on the revolving line of credit and then declared a default. The termination of advances under the revolving line of credit and the declaration of default, however, were completely separate and apart from and were totally independent of the three payments which were made. On the most fundamental level, one had nothing to do and no relationship with the other. Allfirst would have terminated the line and declared the default whether or not the payments were made. The CCI customers would have wired their payments to Allfirst for crediting to CCI's account whether or not

19

Allfirst had terminated the line and declared the default. And, the first payment actually arrived and was applied on February 22, 2000 - before Allfirst notified CCI on February 23 that the line was terminated and before Allfirst issued the notice of default on February 24.

Despite Plaintiffs' misdirection stratagem, § 547(c)(2)(B) looks entirely to the circumstances in which the transfer was made. Section 547(c)(2)(B) does not provide that the debtor cannot be in default or weakened financial circumstances or that the creditor must be continuing its credit extension at the time the challenged transfer is made. The ordinary business payment exception is not the new value exception under § 547(c)(1). Although a Court may consider a debtor's insolvency or default status as a context to measure whether there were extraordinary collection activities to effect payment or unusual happenings to secure in the transfer, the mere fact of insolvency or default status does not block the ordinary course exemption.

Case authority is firmly in support of Allfirst's position that the ordinary course defense is not barred by Allfirst's knowledge of CCI's financial straits, the declaration of default, or the refusal to extend further credit by advancing under the line. In *In re Sims Office Supply, Inc.*, 94 B.R. 744 (Bankr. M.D. Fla. 1988), the Bankruptcy Court held that payments made after a declaration of default on a term loan could qualify for the ordinary course defense. As the Bankruptcy Court wrote:

> Second, the Debtor argues the payments made after the December 5, 1986 letter of default cannot be considered made in the ordinary course of business. The Debtor contends the payments were made in response to Defendant's letter which would make the payments a response to unusual collection efforts, thus not in the ordinary course of business. Plaintiff made payments for two and one-half years prior to the sending of the letter. There is no evidence to establish the subsequent payments were made solely in response to the letter. Thus, this argument is without merit. There is no deviation in the payment method or stream to destroy the ordinary course of business exception.

20

*Id.* at 749 (citation omitted); *see also In re Roblin Indus., Inc.*, 78 F.3d 30, 41 (2d Cir. 1996) (The Second Circuit (albeit in the objective context of § 547(c)(3) rather than the subjective context of § 547(c)(2)) stated: "We decline to adopt a rule that payments made pursuant to debt restructuring agreements, **even when the debt is in default**, can never be made according to ordinary business terms as a matter of law." (Emphasis added).); *Magic*, 64 B.R. 269 (creditor's knowledge of debtor's financial problems does not remove transfer from ordinary course exception); *see also* William L. Norton, Jr., 3 *Norton Bankruptcy Law and Practice 2d* § 57.19, at 57-92 (Mar. 2004) ("It is apparently not sufficient that either or both parties are aware of the declining or weak financial status of the debtor, unless they act upon this awareness by unusual actions to collect or pay the existing debt. The section does not reincorporate the Bankruptcy Act [§ 60B] requirement that the creditor lack reason to believe that the debtor is insolvent in cases in which no unusual conduct occurs.").

In pertinent decision, a United States District Court did not require a lender to continue to extend credit to a financially troubled debtor to avail itself of the ordinary course of business exception. *In re Oliver's Stores, Inc.*, Civil Action No. 90-381, 1990 U.S. Dist. LEXIS 15417 (D.N.J. June 4, 1990). In affirming the Bankruptcy Court in that case, the District Court held that the repayment in full of a line of credit from stock issuance proceeds originally intended to repay the line of credit, which occurred during the preference period and while the lender knew of the debtor's dire financial situation, was subject to the ordinary course of business exception even though the lender had refused to extend the maturity of the line of credit or extend further credit to the debtor at the time payment was made. In explaining its rejection of the Trustee's argument, the District Court stated:

21

The Trustee further argues, albeit inconsistently, that MHTCo's refusal to grant Oliver's further credit and failure to extend the maturity date of the July 1986 Line counsels in favor of finding that the payment to MHTCo was made outside the ordinary course of the parties' business. This contention does not warrant serious consideration because it is based upon the faulty and illogical premise that the July 1986 Line can only have been within the ordinary course of the parties' business if Oliver's was somehow entitled to subsequent lines of credit from MHTCo at will. Such a premise, of course, completely ignores MHTCo's obligation to employ its sound business judgment in limiting the amount of outstanding credit to individual customers and appraise the continued creditworthiness of a customer where, as here, the value of that customer's stock has precipitously dropped over a three month period. Moreover, this premise directly contradicts the policy of the Bankruptcy Code that creditors refrain from creating "voracious 'money pits'" by throwing good money after bad in order to recoup some of their previous losses. *J.P. Fyfe*, 96 B.R. at 477 n.1. MHTCo's refusal to provide additional credit facilities to Oliver's and to extend the maturity date of the July 1986 Line had no impact on whether the $3,000,000.00 transfer was made in the ordinary course of the parties' business.

*Oliver's*, 1990 U.S. Dist. LEXIS 15417, at 28-29. Similarly, Allfirst should not have been required to continue funding a line of credit after being told by the CCI that it had sustained a huge operating loss and would have a multi-million dollar cash shortfall over the forthcoming several month period to be able to avail itself of the ordinary course of business defense as to three payments that were completely unrelated to the termination of the line of credit and the declaration of default.

> (iii)    **Allfirst did not wrongfully terminate the availability of the revolving line of credit.**

Plaintiffs also advance a new argument as to why the three transfers were not in the ordinary course. Plaintiffs contend that Allfirst breached the loan documents when it demanded payment and terminated the line of credit. This argument is specious at best. The promissory note, consistent with the commitment letter, specified that the loan was on a demand basis. No default was necessary

22

to require immediate repayment. The promissory note specified that advances under the revolver would terminate either upon a demand for payment or a default. Plaintiffs contend that Allfirst was required to give notice of a default before terminating the line on the basis of the default. Whether Allfirst was or was not required to notice a default before acting upon it is irrelevant: the loan was on a demand basis and no notice was required for a demand to be made or for the revolver's availability to cease upon the demand.

And, the commitment letter specifically permitted Allfirst to close down the revolver for any reason at any time. There is no requirement in the commitment letter for advance notice of a termination of the revolver.

In his fraud trial, John Ortenzio raised this same argument. Judge Rambo rejected his position. Judge Rambo specifically ruled that a default was not necessary to terminate the revolver. Because the loan was on a demand basis and a demand was made, Allfirst properly terminated the availability of the revolver to CCI. *Allfirst*, No. 1:CV-0786.

### (iv)     Plaintiffs' expert provided incredible testimony.

J. F. "Chip" Morrow testified that in his opinion the three transfers were not in the ordinary course of business between CCI and Allfirst. Morrow, a compurgator for hire, had no knowledge of CCI or Allfirst before accepting his assignment in this case. His credibility as an expert on what was the ordinary course of business between Allfirst and CCI, like his pre-assignment knowledge of the basis facts, did not exist. The Court should discount and disregard his testimony on this issue as being a mere paid expression of an opinion upon which he possessed no prior knowledge and should disregard the opinion as being irrelevant.

23

### (v)   The three payments and the returned checks.

Plaintiffs place great emphasis on the return by Allfirst of checks that could have been paid

from the deposits received.  Under the cash management facility, presented checks normally would

be paid from deposits received that day.  But, all of the checks presented on February 22, 2000 were

paid from the deposit made on this date, and only the balance remaining after the checks were paid

was automatically swept at the end of the day and applied to the balance on the line.

The payments received on February 24 and 25, 2000 would have provided sufficient funds

to pay the checks presented on those days.  These checks aggregated only $417,000.  There still was

a substantial balance to apply to the line at day's end even if the checks had been paid those two

days.  And, Allfirst actually advanced funds to cover the payroll account, making the net applied to

the line less than the total amount of the deposits.

Plaintiffs overlook an even more significant point.  Section 547(c)(2) requires a payment to

be apportioned between that part that may be entitled to the ordinary course of business exception

and that part that is not.  The opening phrase of the statute states:

> (c)  The trustee may not avoid under this section a transfer-
>
> . . . .
>
> **(2)  to the extent that such transfer was-**
> > (A) . . . .
> > (B) . . . .; and
> > (C) . . . .

*Id.* (emphasis added).  This "to the extent that such transfer was" phrase is exactly the language used

to preface the new value exception of § 547(c)(1).

In *In re Spada*, 903 F.2d 971 (3d Cir. 1990), the Third Circuit held that a Bankruptcy Court

24

must apportion a preferential transfer between that portion eligible for the new value exception and that portion which was not. The Third Circuit focused on the "to the extent" phrase of § 547(c)(2) preceding the delineation of the requirements for the new value exception in reaching its conclusion. *Spada*, 903 F.2d at 975-76.

If this Court determines that the application of deposits that could have been used to pay dishonored checks on February 24 and 25 was not in the ordinary course of business, then only $417,000 can be avoided. The balance of $1,389,450 was in excess of the presented checks and was transferred at the end of the two days in the ordinary course of business of CCI and Allfirst consistent with the literal terms of the contract and nine years of dealings between the parties.

A further problem exists for avoiding even the $417,000. This money does not belong to CCI. Had Allfirst honored the checks, the funds would not have remained with CCI but would have been paid to creditors. Each creditor would be entitled to contest preference avoidance and assert its own new value and ordinary course of business defenses. As the Third Circuit noted in *Spada*, 903 F.2d 971, "[t]he purpose of the preferential transfer rule is to return all parties to the position they would have been in had it not been for the premature raid on the debtor's assets." *Id.* at 978 n.8. Permitting Plaintiffs to recover funds that, had Allfirst paid the $417,000 in checks, would not have been in CCI possession but would have been in the possession of the check payees would not be to return the parties to their original positions.

### 3. The payments were made according to ordinary business terms.

The third element of the § 547(c)(2) exemption requires that the payment be made "according to ordinary business terms." The Allfirst line of credit and cash management facility were typical products offered by commercial banks both in general and in the market in which Allfirst

25

participated. There is nothing to make the repayment or other terms of the Allfirst line of credit and cash management facility idiosyncratic or unusual in any respect. The repayment terms in particular are usual, customary, and ordinary for revolving lines of credit offered by lenders in the Mid-Atlantic region.

In *In re Molded Acoustical Products, Inc.*, 18 F.3d 217 (3d Cir. 1994), the Third Circuit adopted the test to determine ordinary business terms employed by the Seventh Circuit in *In re Tolona Pizza Products Corp.*, 3 F.3d 1029 (7th Cir. 1993), which the Third Circuit quoted and commented upon as follows:

> The Seventh Circuit, conscious of this difficulty, eschewed a bright line approach, concluding that:
>
> > "ordinary business terms" refers to the *range* of terms that encompasses the practices in which firms similar in some general way to the creditor in question engage, and that only dealings so idiosyncratic as to fall outside that broad range should be deemed extraordinary and therefore outside the scope of subsection C.
>
> *Id.* at 1033 (quoted in *In re U.S.A. Inns of Eureka Springs, Ark., Inc.)*, 9 F.3d 680, 685 (8th Cir. 1993)). Preferring to stay true to what scarce legislative history there is, we substitute the word 'unusual' for 'idiosyncratic' but otherwise adopt *Tolona Pizza's* definition.

*Molded*, 18 F.3d at 224. The Third Circuit, however, did not just adopt but expanded upon the Seventh Circuit's test by holding that the longer the duration of the relationship between the creditor and the debtor, the more the creditor would be permitted to vary credit terms that are otherwise standard in the industry. As the Third Circuit held:

> With all that said, we adopt the following rule of construction as an aid to resolving these problems: the more cemented (as measured by its duration) the pre-insolvency relationship between the debtor

and the creditor, the more the creditor will be allowed to vary its credit terms from the industry norm yet remain within the safe harbor of § 547(c)(2).

*Molded*, 18 F.3d at 225.

The inquiry into whether credit has been extended according to ordinary business terms focuses upon the creditor's competitors and their repayment terms and collection practices. *In re Spirit Holding Co.*, 214 B.R. 891, 899 (E.D. Mo. E. Div. 1997), *aff'd*, 153 F.3d 902 (8th Cir. 1998) ("The 'ordinary business terms' test is an objective test which focuses upon the practices of the creditor's competitors.") (citation omitted); *In re Schwinn Bicycle Co.*, 205 B.R. 557, 573 (Bankr. N.D. Ill. E. Div. 1997). The goal is to determine whether the subject transaction comports with standard conduct in the industry: were the terms and practices between the parties similar in a general way to the terms and practices of other creditors and debtors in the relevant industry or were they unusual or idiosyncratic. *Roblin*, 78 F.3d at 42 ("'[O]rdinary business terms' must include those terms employed by similarly situated debtors and creditors facing the same or similar problems."); *R.M.L.*, 195 B.R. at 616 (There was no "evidence . . . to establish a range of conduct in a relevant industry with which to compare the parties' practices.").

Craig Schwartz, an Allfirst vice president and CCI's lending officer for several years, testified as an expert on ordinary business terms in the Harrisburg area banking market. Mr. Schwartz has been a middle market lender for Allfirst for over 20 years and is thoroughly familiar with the Pennsylvania market in which he has represented Allfirst. T 86-88, 117-126. Mr. Schwartz testified that he was familiar with the lending and cash management products which he offered on behalf of Allfirst and those competing products offered on behalf of other banks. Tr. Vol. 1. 117-126. Mr. Schwartz was the account officer for other construction companies to which he has

27

extended the identical revolving line of credit/cash management product as was extended to CCI. He testified that the terms and payment practices of these construction companies were the same as those of CCI. Tr. Vol. 1. 123. Mr. Schwartz's opined that the CCI revolving line of credit and cash management facility was extended and administered according to ordinary business terms. Tr. Vol. 1. 130. *See In re Global Tissue, L.L.C.*, 106 Fed. Appx. 99, 103, 2004 WL 1510091, at *4 (3d Cir. July 7, 2004) ("[T]estimony from employees of the parties involved in a preference payment dispute may be used to establish an industry standard, as long as the court determines that the employees are credible and have significant and relevant industry experience."); *see also U.S.A. Inns*, 9 F.3d 680; *In re Cherrydale Farms, Inc.*, No. 99-597, 2001 WL 1820323 (Bankr. D. Del. Feb. 20, 2001).

W. Gary Dorsch, a co-founder of Allegiance Capital Limited Partnership, a privately held mezzanine venture capital fund operating in the Mid- Atlantic region, also testified as an expert on behalf of Allfirst. Mr. Dorsch was a Senior Vice President and Division Head of Bank of America, and its predecessors, Nations Bank and Maryland National Bank, until leaving to found Allegiance Capital. Mr. Dorsch headed the commercial banking department, with a focus on middle market companies in the Mid-Atlantic region (including Pennsylvania). Bank of America (and its predecessors) was the principal competitor of Allfirst in middle market lending in the Mid-Atlantic region. Tr. Vol. 2. 98-110.

Mr. Dorsch opined that the Allfirst line of credit and cash management facility were typical banking products and were made and administered according to ordinary business terms. Tr. Vol. 2. 113-129.

CCI and St. Paul, on the other hand, presented expert testimony from J. F. "Chip" Morrow on the issue of ordinary business terms. Morrow is a professional expert for hire, equipped with a

28

website and an 800 number to assist his efforts in ferreting assignments. Tr. Vol. 2. 201. Morrow professes himself to be an expert on a panoply of subjects, including the appraisal of real estate, banking, business consulting, business strategy, business valuations, economic consulting, due diligence, fiduciary duties, being an expert witness, franchising, fraud, lender liability, mortgage servicing, mortgage underwriting, real estate, and residential mortgages, in addition to being an expert on ordinary business terms in the banking industry. Tr. Vol. 2. 201-203. Morrow's experience almost exclusively derives from small west coast banks serving a limited market in California and adjoining west coast states. Tr. Vol. 2. 205-212. Despite protestations from him, Morrow's principal experience has been in residential mortgage lending. Tr. Vol. 2. 203-4. Morrow has never been affiliated with a bank making a direct loan to a company operating in the Mid-Atlantic region. Tr. Vol. 2. 213. He could not identify Allfirst's chief competitors in the market in which it did business. Tr. Vol. 2. 213. As could be expected, Morrow, in a somewhat befuddled presentation, sciolistically opined that the Allfirst line of credit and cash management facility were not in accordance with ordinary business terms. Morrow's dearth of experience contrasts sharply with the relevant and extensive experience of Schwartz and Dorsch, both of whom have sound backgrounds in commercial banking and the relevant lending market. Because of Morrow's glaring inadequacies, as brought out in *voir dire*, Allfirst declined to cross examine him on the substance or relevancy of the opinions he expressed. Tr. Vol. 2. 240. This Court should likewise discount his hollow testimony.

In the present situation, the revolving line of credit\cash management facility extended by Allfirst to CCI was a standard product of the banking industry, offered by Allfirst and its competitors. The terms of CCI's facility, including the repayment terms, were in all respects

29

customary and normal and in the range of what was available from institutions in the commercial banking industry. Furthermore, Allfirst and CCI have had a nine year relationship. In *Molded*, the Third Circuit found that an 18-month relationship "was of a sufficiently long duration that the relationship is entitled to some leeway, meaning that we might approve a not insubstantial departure from the established . . . industry norm." 18 F.3d at 227. With CCI, the repayment terms were both standard to the industry and of unquestionably lengthy duration. CCI's three challenged payments were made in accordance with these terms.

The third prong - ordinary business terms - has been established.

## B. No set-off occurred.

### 1. A set-off cannot also be a preference.

Besides asserting that the three payments were avoidable preferences, Plaintiffs persist in alleging that Allfirst set-off the payments in contravention of § 553(b) of the Bankruptcy Code. In making this assertion, CCI forgets that an amount which is offset by a bank cannot be a preference.

A preference involves a transfer, which is defined in § 101(54) of the Bankruptcy Code as "every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption; . . . ." As the definition indicates, a transfer involves a disposition of property. Under § 547(b) of the Bankruptcy Code, a preference requires a transfer. A set-off, however, is not a transfer because it does not involve a disposition of property. A deposit account at a bank represents a debt owed by the bank to the depositor. When there is a set-off, the bank's debt to the depositor is cancelled by the depositor's debt to the bank. There is, however, no disposition or conveyance of money from one person to another.

30

The CCI account was a zero balance account. It did not have balances. It received payments that were applied at day's end either to the unpaid balance on the revolver or to an overnight investment. When money went from a CCI customer (or CCI) to the account, there was a transfer of money, which was to be applied in accordance with the cash management contract. There was no offset of mutual debts.

Recognizing this distinction, § 553(a) expressly excludes the right to challenge or avoid under any provision of the Bankruptcy Code any amount set-off pre-petition with respect to a pre-petition debt except to the extent provided in § 553 itself or in §§ 362 and 363 of the Bankruptcy Code. *See Lee v. Schweiker*, 739 F.2d 870, 873 n.4 (3d Cir. 1984) ("[W]here a set-off right is being asserted, section 553, rather than section 547 governs the creditors rights."); *see also In re Carnell Constr. Corp.*, 424 F.2d 296, 299 (3d Cir. 1970) ("[T]he Bank's set-off of Carnell's deposit to the amount of Carnell's indebtedness to the Bank was not a preference since under section 68 of the Bankruptcy Act as construed by the decisional law the Bank had the right to make the set-off." (Citation omitted)). The three payments were preferential transfers. They cannot also be set-offs.

### 2. Allfirst withdrew the money pursuant to the cash management agreement and did not effect a common law offset.

Although a set-off cannot be an avoidable preference, the payments made to Allfirst were not offset by Allfirst. Allfirst applied the payments in accordance with the express provisions of the cash management contract between Allfirst and CCI and not in accordance with a common law right under Pennsylvania law. *See Pa. Nat'l Bank & Trust Co. v. CCNB Bank, N.A.*, 446 Pa. Super. 625, 629, 667 A.2d 1151, 1153 (1995) ("[T]he right of set-off has long been recognized as part of the common law of Pennsylvania." (Citations omitted)); Barkley Clark & Barbara Clark, 1 *The Law of*

31

*Secured Transactions under the Uniform Commercial Code* ¶ 1.08[9][d][i] (rev. ed. May 2003) (right of set-off comes from common law).

### (i)     Under federal law, Allfirst did not set-off the account.

Normally, the question of whether a bank has a right to set-off a deposit account is a question of state law. But, the issue of whether a bank has actually exercised a right of set-off provided by state law is a matter of federal law. *Citizens Bank of Md. v. Strumpf*, 516 U.S. 16 (1995). In the *Citizens* case, the Supreme Court laid down a three part test under federal law to determine whether a set-off had occurred. There must be "(i) a decision to effectuate a set-off, (ii) some action accomplishing the set-off, and (iii) a recording of the set-off." *Id.* at 19 (citations omitted). These three requirements have not been met with respect to the application of the challenged payment. Allfirst never intended to offset the CCI account and took no steps to do so. Nor did it record the action as a set-off. Allfirst, when it accepted the promissory note with the set-off provision crossed out, waived any right it may have had to effect a set-off of the account, leaving the account subject only to the cash management provisions without the right of offset.

Under the three part *Citizens* test, the payments made by CCI's customers were not deposits offset by Allfirst. They were payments applied to an existing indebtedness pursuant to a contract between CCI and Allfirst. The application of the money received was independent of whether Allfirst had the right at the time the payments were applied to effect an offset of the deposit in the account. Allfirst acted pursuant to a contract and not pursuant to a common law right (a right excluded by that contract).

### (ii)     Allfirst contractually waived the right to offset the account.

If the testimony of Phillips is credited and if Allfirst is bound by the cross outs on the

32

promissory note, then Allfirst contractually waived the right to offset the CCI account. *Smith v. Stricker*, 126 Pa. Super. Ct. 181, 185, 186 A. 369, 370 (1936) ("[A] party may, by express contract, waive his right of set-off."); *Loader Leasing Corp. v. Kearns*, 83 F.R.D. 202, 203 (W.D. Pa. 1979) ("A contractual provision which provides that a party waives the right to assert a setoff or counterclaim is rare; however, such a right may be waived."); *see also Hostetter v. Giffin*, 268 Pa. 530, 533, 112 A. 150, 151 (1920) (Although he did not sign the contract, "[b]y his acceptance of and acting under the contract, Sloan became bound by it."). Allfirst agreed to apply the money at day's end – as was done, but agreed that it would not offset during the day – as was not done.

### (iii) The exercise of a contractual right to funds in an account is not a set-off.

While a bank may as a matter of law have the right to set-off a deposit, a bank may also have contractual rights with respect to a deposit which exist separate and independent of the right of set-off and which may be exercised and effectuated without exercising or effectuating the right of offset.

A clear example of such an independent contractual right is the granting of a pledge or security interest in the bank account. *Pittsburgh Nat'l Bank v. United States*, 498 F. Supp. 101, 103 (W.D. Pa. 1980), *aff'd*, 657 F.2d 36 (3d Cir. 1981)("[A] borrower may contract with a lending bank to pledge the borrower's deposits in that bank as security for his outstanding loan."). A bank holding such a pledge or security interest may garner the sums in the account by foreclosing upon the pledge or security interest rather than by offsetting. A bank which appropriates the money on deposit as a foreclosure of its pledge or security interest is not subject to challenge under § 553(b) of the Bankruptcy Code. This specific issue came before the Eighth Circuit, the only circuit to rule on the issue, in *Smith v. Mark Twain Nat'l Bank*, 805 F.2d 278 (8th Cir. 1986); *see also In re Cabrillo*, 101 B.R. 443 (Bankr. E.D. Pa. 1989); *In re 4-S Corp.*, 69 B.R. 499 (Bankr. W.D. Mo. S. Div. 1987). The

33

Eighth Circuit clearly held that § 553(b) of the Bankruptcy Code was inapplicable to a bank which took a deposit from its borrowers account in the exercise of a security interest in the account. The court noted that "although the security agreement provided a 'full right of setoff,' Bank was not *required* to set off, since the parties did not limit the Bank's rights and remedies solely to the right of set-off." *Smith*, 805 F.2d at 290 n.20 (citation omitted). The court even held that the marking of the transaction on the bank's records as a set-off was not dispositive on the question of whether a foreclosure or offset had occurred, particularly where the notation was made by non-lawyers who do not understand the legal significance of the terms they are using. *Id.* (citing *Apple Computer, Inc. v. Franklin Computer Corp.*, 714 F.2d 1240, 1250 n.8 (3d Cir. 1983)). The court suggested that courts "should focus on the economic reality of the situation." *Smith*, 805 F.2d at 290 n.20 (citations omitted).

Allfirst may not have foreclosed a security interest in the CCI account when it applied the three payments (unless Sherri Phillips crossing out of the security provisions of the note is disregarded, in which event Allfirst had a pledge of the account), but it did act pursuant to a contract that was separate from and independent of its right of set-off. This contract provided Allfirst with both a right and an obligation to apply the balance in the account at the end of the day either to the line of credit or to an overnight investment. Just as § 553(b) of the Bankruptcy Code is inapplicable to the foreclosure of a security interest in the monies in a deposit account, so to is § 553(b) inapplicable to a sweep of the monies in that account according to the ordinary and customary practices of the parties set forth in a cash management contract. Allfirst acted pursuant to a contract and not in the exercise of its right of set-off.

34

# IV.
## Conclusion.

Allfirst's action with respect to the application of the three preferential payments to the sums owed by CCI under the revolving line of credit was not a set-off of a deposit governed by § 553(b) of the Bankruptcy Code. The preferential payments are unavoidable under § 547(c)(2) as ordinary course of business transfers. A judgment in favor of Allfirst should be entered.

Lawrence J. Gebhardt
Michael D. Nord
Pennsylvania Bar No. 52486
GEBHARDT & SMITH LLP
The World Trade Center, 9th Floor
401 E. Pratt Street
Baltimore, MD 21202

*Attorneys for Defendant, Allfirst Bank*

35

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY on this 2nd day of May, 2005, copies of the *Manufacturers and Traders*

*Trust Company Post Trial Brief* was sent via general delivery mail, postage prepaid, to:

Robert E. Chernicoff, Esquire
CUNNINGHAM & CHERNICOFF, P.C.
2320 North Second Street
Harrisburg, Pennsylvania 17110

and

Gary S. Posner, Esquire
WHITEFORD, TAYLOR & PRESTON, L.L.P.
Seven Saint Paul Street
Baltimore, MD 21202

Lawrence J. Gebhardt

36

**A**

 **allfirst**

CCI CONSTRUCTION INC
P.O. BOX 8800
CAMP HILL PA 17001-8800                    OP

Ալ11լ11լ11լ11լ11լ11լ11լ11լ11լ11

# Corporate Checking

February 1, 2000 thru February 29, 2000

CCI CONSTRUCTION INC

**★ Account Number**
00288-6451-4

**For assistance call**
The Financial Center
1-800-220-6004

**★** There was a zero balance
payroll account that drew funds
from this account as checks were presented

**Activity Summary**

| | | | |
|---|---|---|---|
| Avg daily ledger balance | -46,616.06 | Balance on 01/31 | $323,137.00 |
| | | 000006 deposits | 1,246,518.82 ✓ |
| | | 000373 checks/list post | -5,962,458.45 ✓ |
| | | Funds transfers (net) | 5,260,757.03 ✓ |
| | | Other credits | 754,545.47 ✓ |
| | | Other debits | -1,807,463.58 |
| | | Balance on 02/29 | -184,963.71 |

**Deposits** - There are deposits other than by ACH transfer.

| Date | Amount | Serial Number | Reference Number | Date | Amount | Serial Number | Reference Number |
|---|---|---|---|---|---|---|---|
| 02/07 | $356,193.16 | | 021399709 | 02/15 | $482,605.52 | | 023457020 |
| 02/11 | 14,000.00 | | 021318866 | 02/16 | 22,277.92 | | 021226319 |
| 02/14 | 359,995.26 | | 021680603 | 02/23 | 11,446.96 | | 021189594 |
| | | | | | $1,246,518.82 | Deposits Total | |

**Checks/List Post** - These are all checks that were presented. Not all were paid. Unpaid checks are
* Denotes missing sequence number         listed as "Debit Reversals" on page 11-15.

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000058719 | $134.14 | 02/16 | 020559045 | 0000059593 * | $10.00 | 02/10 | 020685116 |
| 0000059471 * | 11,468.06 | 02/22 | 021659050 | 0000059624 * | 145.82 | 02/02 | 021417752 |
| 0000059491 * | 863.08 | 02/01 | 018640070 | 0000059723 * | 72.48 | 02/14 | 021480092 |
| 0000059492 | 137.27 | 02/24 | 020150693 | 0000059731 * | 5.21 | 02/16 | 021066427 |
| 0000059522 * | 37.33 | 02/01 | 021251518 | 0000059733 * | 9,432.40 | 02/08 | 021528187 |
| 0000059534 * | 276.80 | 02/04 | 021859301 | 0000059756 * | 5.18 | 02/16 | 021044002 |
| 0000059572 * | 144.20 | 02/24 | 021256353 | 0000059780 * | 432.00 | 02/18 | 020090527 |

Continued on back

608555
0019831791486  C50

Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000059821 * | $1,530.00 | 02/10 | 021023485 | 0000060083 * | $323.66 | 02/04 | 021873940 |
| 0000059847 * | 8,917.62 | 02/04 | 021833494 | 0000060089 * | 133.20 | 02/02 | 021460364 |
| 0000059862 * | 1,848.00 | 02/02 | 021464629 | 0000060090 | 220.00 | 02/01 | 021199169 |
| 0000059870 * | 2,940.91 | 02/01 | 021229418 | 0000060099 * | 9,742.50 | 02/03 | 021658364 |
| 0000059902 * | 425.56 | 02/10 | 012580493 | 0000060101 * | 3,403.02 | 02/02 | 021486146 |
| 0000059930 * | 250.00 | 02/03 | 021645818 | 0000060113 * | 269.26 | 02/01 | 021251708 |
| 0000059945 * | 595.44 | 02/07 | 021227053 | 0000060116 * | 30.00 | 02/02 | 021473280 |
| 0000059946 | 558.70 | 02/09 | 021771347 | 0000060121 * | 138,006.50 | 02/04 | 021863600 |
| 0000059947 * | 50.01 | 02/01 | 021204991 | 0000060125 * | 564.00 | 02/01 | 021225055 |
| 0000059950 * | 582.23 | 02/14 | 021515121 | 0000060127 * | 525.00 | 02/02 | 016072897 |
| 0000059952 * | 757.42 | 02/09 | 021717045 | 0000060142 * | 305.28 | 02/01 | 021268042 |
| 0000059956 * | 2,190.01 | 02/04 | 021869236 | 0000060151 * | 481.47 | 02/03 | 021613302 |
| 0000059966 * | 206,758.00 | 02/02 | 021470156 | 0000060155 * | 25,307.10 | 02/23 | 012523451 |
| 0000059971 * | 100.00 | 02/02 | 021443229 | 0000060159 * | 2,561.57 | 02/01 | 021270671 |
| 0000059972 * | 154,138.35 | 02/01 | 014238290 | 0000060170 * | 234,701.20 | 02/07 | 016839918 |
| 0000059976 * | 2,673.40 | 02/09 | 021774955 | 0000060172 * | 1,668.50 | 02/01 | 021243309 |
| 0000059977 * | 1,982.17 | 02/01 | 021826635 | 0000060173 * | 3,280.00 | 02/01 | 021182426 |
| 0000059984 * | 649,978.16 | 02/02 | 021473290 | 0000060177 * | 601.65 | 02/04 | 021812284 |
| 0000059985 * | 188.94 | 02/04 | 021859226 | 0000060183 * | 6,677.50 | 02/01 | 021266003 |
| 0000059988 * | 9,881.45 | 02/02 | 021466760 | 0000060184 * | 157.38 | 02/16 | 012822153 |
| 0000059994 * | 369.84 | 02/01 | 014238190 | 0000060189 * | 5,038.90 | 02/10 | 021045858 |
| 0000059996 * | 7,645.74 | 02/01 | 021269560 | 0000060203 * | 9,025.00 | 02/17 | 023490292 |
| 0000059998 * | 300.00 | 02/02 | 021443228 | 0000060204 | 36,814.07 | 02/18 | 021536924 |
| 0000059999 * | 33,669.50 | 02/03 | 021656270 | 0000060206 * | 557.16 | 02/01 | 021239588 |
| 0000060006 * | 148,539.15 | 02/03 | 021682359 | 0000060209 * | 333.79 | 02/07 | 021159406 |
| 0000060007 | 11,700.00 | 02/03 | 021682360 | 0000060210 | 2,079.00 | 02/07 | 021159405 |
| 0000060010 * | 6,226.76 | 02/02 | 021661330 | 0000060212 * | 705.66 | 02/11 | 021196149 |
| 0000060015 * | 31.00 | 02/01 | 014239195 | 0000060213 | 110,257.00 | 02/08 | 021529598 |
| 0000060018 * | 834.31 | 02/03 | 021668574 | 0000060217 * | 283,500.00 | 02/16 | 021045031 |
| 0000060019 * | 11,746.25 | 02/03 | 021655676 | 0000060221 * | 906.89 | 02/09 | 021717044 |
| 0000060020 | 450.00 | 02/03 | 021645316 | 0000060222 | 47,630.60 | 02/07 | 021268327 |
| 0000060021 | 155.70 | 02/02 | 021443227 | 0000060223 | 7,885.08 | 02/28 | 012730603 |
| 0000060025 * | 3,610.00 | 02/25 | 020342030 | 0000060224 | 2,034.75 | 02/01 | 021249126 |
| 0000060026 * | 237.68 | 02/02 | 021443226 | 0000060225 | 6,217.31 | 02/07 | 021227559 |
| 0000060037 * | 74.32 | 02/02 | 021479041 | 0000060226 | 189,513.60 | 02/02 | 021473343 |
| 0000060053 * | 136.43 | 02/01 | 021239589 | 0000060227 | 14.32 | 02/10 | 021891721 |
| 0000060055 * | 210.00 | 02/10 | 021045860 | 0000060228 | 7,823.70 | 02/09 | 021761571 |
| 0000060080 * | 195.72 | 02/02 | 021479593 | 0000060229 | 6,997.65 | 02/04 | 018819885 |
| 0000060081 | 112,188.80 | 02/01 | 021182531 | 0000060230 | 5,850.00 | 02/04 | 021864136 |

Continued on next page

 allfirst

CCI CONSTRUCTION INC

Account Number
00288-6451-4

**2** For assistance call
The Financial Center
1-800-220-6004

Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060231 | $57.73 | 02/08 | 018305375 | 0C00060267 * | $39.68 | 02/08 | 021548529 |
| 0000060232 | 6,531.89 | 02/11 | 021223990 | 0000060268 | 4,304.54 | 02/02 | 021473532 |
| 0000060233 | 131.25 | 02/02 | 021490918 | 0000060269 | 7,767.90 | 02/09 | 021748654 |
| 0000060234 | 251.00 | 02/09 | C21733131 | 0000060270 | 2,367.31 | 02/07 | 018482927 |
| 0000060235 | 46.96 | 02/07 | 021231024 | 0000060271 | 12,290.48 | 02/02 | 020352567 |
| 0000060236 | 24,327.00 | 02/04 | 012281395 | 0000060272 | 4,226.00 | 02/11 | 021227547 |
| 0000060237 | 146.51 | 02/08 | 021563985 | 0000060273 | 3,886.65 | 02/02 | 021481668 |
| 0000060238 | 15,795.00 | 02/03 | 016388967 | 0000060274 | 12,481.14 | 02/02 | 021417634 |
| 0000060239 | 174.70 | 02/08 | 021537911 | 0000060275 | 5,068.95 | 02/03 | 021653141 |
| 0000060240 | 58.95 | 02/07 | 095792742 | 0000060276 | 60.00 | 02/02 | 021445696 |
| 0000060241 | 2,718.05 | 02/03 | 021669955 | 0000060277 | 30,475.80 | 02/02 | 012583532 |
| 0000060242 | 1,603.54 | 02/03 | 021652837 | 0000060278 | 12,034.60 | 02/07 | 021231197 |
| 0000060243 | 34,263.00 | 02/07 | 021257039 | 0000060279 | 124,454.20 | 02/04 | 014215052 |
| 0000060244 | 180.55 | 02/09 | 021747030 | 0000060280 | 315,000.00 | 02/04 | 021848523 |
| 0000060245 | 2,258.66 | 02/02 | 018048001 | 0000060281 | 492.47 | 02/08 | 021474168 |
| 0000060246 | 24,228.45 | 02/03 | 021654728 | 0000060283 * | 5,419.07 | 02/07 | 021248360 |
| 0000060247 | 58,724.84 | 02/03 | 021654729 | 0000060284 | 815.97 | 02/07 | 021215066 |
| 0000060248 | 2,406.84 | 02/14 | 021426801 | 0000060285 | 4,857.00 | 02/11 | 018084410 |
| 0000060249 | 24,003.00 | 02/09 | 021745546 | 0000060286 | 21,600.00 | 02/11 | 021196215 |
| 0000060250 | 7,449.30 | 02/22 | 018715133 | 0000060305 * | 3,127.50 | 02/18 | 021365721 |
| 0000060251 | 24.38 | 02/09 | 021745608 | 0000060309 * | 17.00 | 02/17 | 016677794 |
| 0000060252 | 1,291.00 | 02/03 | 021611618 | 0000060311 * | 502.20 | 02/24 | 020150694 |
| 0000060253 | 478.01 | 02/24 | 021297527 | 0000060312 | 15.45 | 02/22 | 021661049 |
| 0000060254 | 513.98 | 02/02 | 021426456 | 0000060315 * | 260.00 | 02/18 | 021371903 |
| 0000060255 | 19,135.30 | 02/10 | 021054933 | 0000060320 * | 20.00 | 02/18 | 021388819 |
| 0000060256 | 13,624.56 | 02/04 | 021832799 | 0000060324 * | 265.35 | 02/18 | 021412189 |
| 0000060257 | 13.45 | 02/01 | 021226994 | 0000060327 * | 534.57 | 02/24 | 021314140 |
| 0000060258 | 5,733.00 | 02/14 | 021520446 | 0000060330 * | 130.12 | 02/22 | 021665606 |
| 0000060259 | 550.00 | 02/01 | 021222273 | 0000060331 | 603.13 | 02/24 | 021312189 |
| 0000060260 | 57.00 | 02/04 | 018762099 | 0000060349 * | 54.50 | 02/22 | 021671017 |
| 0000060261 | 24,898.17 | 02/07 | 021182617 | 0000060352 * | 749.08 | 02/18 | 018469447 |
| 0000060262 | 5,818.82 | 02/24 | 021286453 | 0000060356 * | 832.99 | 02/14 | 021680602 |
| 0000060263 | 12,233.26 | 02/07 | 021245832 | 0000060358 * | 940.68 | 02/13 | 021381387 |
| 0000060264 | 4,887.00 | 02/22 | 021623007 | 0000060360 * | 150.00 | 02/22 | 021617804 |
| 0000060265 | 31,084.00 | 02/04 | 021853299 | 0000060363 * | 147.65 | 02/25 | 021455909 |

608535
0019931791486 9   050

Continued on back

Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060364 | $619.63 | 02/18 | 021390951 | 0000060461 | $1,442.12 | 02/22 | 021665661 |
| 0000060365 | 21,353.64 | 02/15 | 021868441 | 0000060464 * | 99.36 | 02/22 | 021650709 |
| 0000060369 * | 18.45 | 02/23 | 021102338 | 0000060473 * | 68.90 | 02/23 | 021063728 |
| 0000060370 | 195.00 | 02/18 | 020052479 | 0000060475 * | 6.06 | 02/16 | 021008470 |
| 0000060371 | 72,923.73 | 02/17 | 023538623 | 0000060490 * | 2,000.00 | 02/24 | 021315946 |
| 0000060372 | 8,330.28 | 02/23 | 012164783 | 0000060491 | 2,829.75 | 02/24 | 021315947 |
| 0000060372 | 8,330.28 | 02/28 | 012041597 | 0000060492 | 53,750.10 | 02/15 | 021804284 |
| 0000060375 * | 184.00 | 02/22 | 021623412 | 0000060499 * | 16.96 | 02/17 | 023504566 |
| 0000060376 | 75.05 | 02/17 | 023525046 | 0000060502 * | 73.19 | 02/28 | 021771082 |
| 0000060378 * | 2,253.09 | 02/16 | 021007079 | 0000060505 * | 90.95 | 02/22 | 021638989 |
| 0000060379 | 1,194.47 | 02/16 | 018725929 | 0000060507 * | 5,017.80 | 02/17 | 023543300 |
| 0000060380 | 4,146.51 | 02/22 | 021666282 | 0000060518 * | 76.27 | 02/23 | 021089102 |
| 0000060382 * | 2,217.52 | 02/18 | 020088643 | 0000060523 * | 9,206.35 | 02/22 | 021609313 |
| 0000060387 * | 8,266.67 | 02/11 | 021329631 | 0000060524 | 125.55 | 02/18 | 021412655 |
| 0000060391 * | 67.25 | 02/24 | 021330426 | 0000060526 * | 180.36 | 02/22 | 021585578 |
| 0000060392 | 584.52 | 02/18 | 021365072 | 0000060528 * | 110.32 | 02/29 | 021139936 |
| 0000060393 | 70.50 | 02/18 | 021374810 | 0000060534 * | 2,574.68 | 02/17 | 023492647 |
| 0000060395 * | 450.00 | 02/22 | 021617805 | 0000060535 | 16,748.11 | 02/22 | 016215691 |
| 0000060403 * | 43.05 | 02/16 | 021008954 | 0000060537 * | 11,935.02 | 02/22 | 021648920 |
| 0000060404 | 369.70 | 02/17 | 016682361 | 0000060538 | 210.31 | 02/22 | 021623833 |
| 0000060407 * | 60.35 | 02/22 | 012549378 | 0000060542 * | 38.16 | 02/23 | 021086433 |
| 0000060408 | 177.17 | 02/15 | 023456939 | 0000060557 * | 95.91 | 02/24 | 021310408 |
| 0000060411 * | 2,614.80 | 02/22 | 021667877 | 0000060564 * | 102.10 | 02/24 | 021316175 |
| 0000060413 * | 374.80 | 02/22 | 021656937 | 0000060573 * | 1,871.00 | 02/18 | 014545481 |
| 0000060417 * | 39.57 | 02/22 | 021661036 | 0000060580 * | 176.40 | 02/23 | 021050615 |
| 0000060418 | 1,575.00 | 02/22 | 016513167 | 0000060588 * | 214.62 | 02/24 | 021319462 |
| 0000060419 | 284.41 | 02/24 | 012578174 | 0000060590 * | 374.60 | 02/18 | 020873737 |
| 0000060435 * | 225.00 | 02/22 | 021629257 | 0000060597 * | 4,819.99 | 02/18 | 021413115 |
| 0000060436 | 233.55 | 02/22 | 021617807 | 0000060598 | 2,818.28 | 02/18 | 021414601 |
| 0000060442 * | 13.04 | 02/28 | 021739640 | 0000060599 | 967.24 | 02/17 | 023486115 |
| 0000060445 * | 118.84 | 02/22 | 021617806 | 0000060601 * | 180.00 | 02/18 | 020052467 |
| 0000060448 * | 1,786.00 | 02/22 | 021640471 | 0000060602 | 136.78 | 02/18 | 020052458 |
| 0000060449 | 243.00 | 02/15 | 021874350 | 0000060603 | 255.00 | 02/18 | 020052457 |
| 0000060450 | 19,708.54 | 02/15 | 023481348 | 0000060607 * | 5,092.60 | 02/16 | 021030048 |
| 0000060453 * | 68.84 | 02/18 | 021420759 | 0000060610 | 221.60 | 02/17 | 023532529 |
| 0000060455 * | 344.93 | 02/29 | 018892342 | 0000060612 * | 72.08 | 02/17 | 023537629 |
| 0000060458 * | 415.52 | 02/18 | 021384064 | 0000060613 | 10,748.49 | 02/22 | 012549105 |
| 0000060459 | 907.60 | 02/17 | 023502796 | 0000060614 | 1,766.97 | 02/18 | 020051666 |
| 0000060460 | 111.48 | 02/23 | 021093727 | 0000060622 * | 4,382.40 | 02/17 | 023525242 |

Continued on next page

allfirst

CCI CONSTRUCTION INC

Account Number
00288-6451-4

For assistance call
The Financial Center
1-800-220-6004

## Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060624 * | $65.00 | 02/23 | 021093603 | 0000060687 | $6,300.00 | 02/22 | 021807398 |
| 0000060625 | 615.75 | 02/22 | 021588840 | 0000060688 | 2,230.00 | 02/22 | 021807400 |
| 0000060628 * | 1,200,000.00 | 02/11 | 021329643 | 0000060689 | 500.00 | 02/22 | 021807399 |
| 0000060634 * | 1,380.00 | 02/24 | 021327674 | 0000060690 | 9,090.00 | 02/28 | 021678282 |
| 0000060635 | 39.68 | 02/24 | 021300253 | 0000060692 * | 540.24 | 02/29 | 021088215 |
| 0000060636 | 6,900.00 | 02/24 | 014440388 | 0000060693 | 7,817.85 | 02/25 | 021605076 |
| 0000060637 | 7,869.60 | 02/24 | 021304829 | 0000060694 | 2,940.00 | 02/24 | 023061363 |
| 0000060638 | 73,632.29 | 02/29 | 021107389 | 0000060695 | 58.81 | 02/28 | 021721294 |
| 0000060639 | 69,698.70 | 02/16 | 021144071 | 0000060696 | 23.20 | 02/28 | 021724990 |
| 0000060640 | 2,172.35 | 02/17 | 021314246 | 0000060697 | 21.70 | 02/29 | 018842714 |
| 0000060641 | 78,279.05 | 02/18 | 021424951 | 0000060699 * | 77.85 | 02/25 | 021441722 |
| 0000060642 | 690.00 | 02/18 | 021424950 | 0000060702 * | 76.84 | 02/29 | 021121839 |
| 0000060643 | 69,005.50 | 02/17 | 023535605 | 0000060706 * | 10,400.00 | 02/29 | 021107390 |
| 0000060644 | 4,855.50 | 02/23 | 021094899 | 0000060707 | 2,703.00 | 02/28 | 021745303 |
| 0000060646 * | 3,965.65 | 02/28 | 021759601 | 0000060708 | 1,076.41 | 02/28 | 021746980 |
| 0000060648 * | 107.42 | 02/18 | 021365654 | 0000060709 | 29.00 | 02/29 | 021103365 |
| 0000060657 * | 17,100.00 | 02/25 | 021471675 | 0000060710 | 37,800.00 | 02/28 | 021678350 |
| 0000060660 * | 104.16 | 02/28 | 021721464 | 0000060711 | 3,947.25 | 02/28 | 021678351 |
| 0000060664 * | 445.01 | 02/28 | 021730911 | 0000060712 | 8,064.27 | 02/28 | 021867537 |
| 0000060665 | 1,486.66 | 02/24 | 018738706 | 0000060714 * | 24,480.00 | 02/28 | 021124064 |
| 0000060665 | 1,486.66 | 02/28 | 012833316 | 0000060716 * | 203.16 | 02/24 | 021278956 |
| 0000060669 * | 16,300.00 | 02/23 | 021189314 | 0000060717 | 665.33 | 02/29 | 021134476 |
| 0000060670 | 16,976.34 | 02/23 | 020744570 | 0000060719 * | 1,645.35 | 02/24 | 021315949 |
| 0000060671 | 261.92 | 02/22 | 021003710 | 0000060720 | 182,733.35 | 02/24 | 021315948 |
| 0000060673 * | 2,002.00 | 02/28 | 021693829 | 0000060721 | 23.85 | 02/24 | 021262411 |
| 0000060674 | 50.00 | 02/25 | 021441724 | 0000060723 * | 833.44 | 02/24 | 021262397 |
| 0000060675 | 378.56 | 02/28 | 021117205 | 0000060724 | 245.87 | 02/24 | 021262396 |
| 0000060676 | 45,323.62 | 02/23 | 021170760 | 0000060725 | 38.90 | 02/24 | 021262400 |
| 0000060676 | 45,323.62 | 02/25 | 012419255 | 0000060726 | 22.29 | 02/24 | 021262401 |
| 0000060678 * | 65.00 | 02/28 | 012694765 | 0000060727 | 780.71 | 02/24 | 021262406 |
| 0000060681 * | 14,528.47 | 02/28 | 021715278 | 0000060728 | 105.84 | 02/24 | 021262408 |
| 0000060682 | 16,658.76 | 02/22 | 021003709 | 0000060729 | 464.81 | 02/24 | 021262398 |
| 0000060684 * | 25,119.00 | 02/25 | 021476442 | 0000060730 | 30.00 | 02/24 | 021262403 |
| 0000060685 | 201.36 | 02/25 | 021471502 | 0000060731 | 149.09 | 02/24 | 021262409 |
| 0000060686 | 150.00 | 02/25 | 021441723 | 0000060733 * | 116.13 | 02/24 | 021262404 |

608555

Continued on back

Checks/List Post - continued

| Serial Number | Amount | Date | Reference Number | Serial Number | Amount | Date | Reference Number |
|---|---|---|---|---|---|---|---|
| 0000060734 | $101.13 | 02/24 | 021262402 | 0000060784 | $1,112.01 | 02/23 | 021094983 |
| 0000060735 | 209.34 | 02/24 | 021262407 | 0000060785 | 700.66 | 02/25 | 018035298 |
| 0000060736 | 842.14 | 02/24 | 021262399 | 0000060786 | 18.55 | 02/29 | 018841993 |
| 0000060737 | 532.06 | 02/24 | 021262395 | 0000060787 | 2,478.09 | 02/29 | 021125890 |
| 0000060739 * | 309.53 | 02/24 | 021262410 | 0000060793 * | 260.23 | 02/24 | 012094454 |
| 0000060740 | 33.04 | 02/24 | 021262405 | 0000060793 | 260.23 | 02/29 | 018319725 |
| 0000060742 * | 133.27 | 02/28 | 021735671 | 0000060794 | 267.14 | 02/28 | 021737992 |
| 0000060743 | 136.49 | 02/29 | 021131591 | 0000060795 | 8.84 | 02/29 | 021125992 |
| 0000060744 | 12,347.31 | 02/24 | 021302776 | 0000060796 | 1,380.36 | 02/28 | 021629643 |
| 0000060746 * | 769.26 | 02/25 | 021457527 | 0000060799 * | 154.00 | 02/28 | 021693828 |
| 0000060748 * | 9,833.36 | 02/25 | 021528449 | 0000060800 | 43,060.72 | 02/25 | 021453137 |
| 0000060750 * | 9,648.00 | 02/28 | 021772418 | 0000060801 | 37.50 | 02/28 | 021708581 |
| 0000060754 * | 133.16 | 02/24 | 021705980 | 0000060802 | 82.50 | 02/28 | 021708582 |
| 0000060755 | 1,626.39 | 02/24 | 021270459 | 0000060803 | 37.50 | 02/28 | 021708583 |
| 0000060756 | 199.35 | 02/23 | 021164243 | 0000060804 | 199.50 | 02/28 | 021708584 |
| 0000060757 | 35,000.00 | 02/24 | 021297204 | 0000060805 | 199.50 | 02/28 | 021708585 |
| 0000060758 | 134.63 | 02/29 | 021120043 | 0000060806 | 37.50 | 02/28 | 021708587 |
| 0000060760 * | 172.50 | 02/28 | 021752843 | 0000060807 | 82.50 | 02/28 | 021708586 |
| 0000060761 | 11,874.49 | 02/28 | 021751147 | 0000060808 | 283.50 | 02/28 | 021745304 |
| 0000060764 * | 1,476.44 | 02/25 | 021414158 | 0000060810 * | 1,214.00 | 02/29 | 021286520 |
| 0000060767 * | 29.61 | 02/29 | 021159191 | 0000060813 * | 241.27 | 02/25 | 021425743 |
| 0000060763 | 15,625.27 | 02/23 | 021016761 | 0000060814 | 1,084.28 | 02/25 | 021425745 |
| 0000060772 * | 225.01 | 02/28 | 021741548 | 0000060815 | 645.53 | 02/25 | 021425744 |
| 0000060773 | 242.63 | 02/28 | 021757634 | 0000060817 * | 32.55 | 02/25 | 021528450 |
| 0000060774 | 4,590.00 | 02/25 | 021469590 | 0000060818 | 184.01 | 02/29 | 021140756 |
| 0000060775 | 1,456.48 | 02/24 | 021290313 | 0000060819 | 41.15 | 02/28 | 021679796 |
| 0000060777 * | 60.00 | 02/28 | 012694760 | 0000060823 * | 475.30 | 02/24 | 021263944 |
| 0000060778 | 68.39 | 02/28 | 012694761 | 0000060827 * | 241.77 | 02/29 | 021112313 |
| 0000060780 * | 85.00 | 02/28 | 012694768 | 0000060828 | 247.00 | 02/29 | 021154434 |
| 0000060781 | 46.16 | 02/28 | 012694769 | 0000060829 | 15.31 | 02/24 | 021295610 |
| 0000060782 | 5,113.00 | 02/28 | 021676415 | 0000060830 | 540.00 | 02/25 | 021425742 |
| 0000060783 | 310.24 | 02/28 | 021737263 | | $5,962,458.45 | Checks Total | |

Continued on next page

 allfirst

CCI CONSTRUCTION INC

Account Number
00288-6451-4

For assistance call
The Financial Center
1-800-220-6004

**Funds Transfers** These are transfers into or out of the
account by ACH or other procedures

| Date | Description | Amount |
|------|-------------|--------|
| 02/01 | ACH CREDIT 100019544 | $1,889,998.00 |
| | COMMONWEALTH    EDIPAYMENT T0267873 | |
| | 15460017450008CCI CONSTRUCTION20000315992143 | |
| | SWEEP LOAN PAYMENT | -1,833,640.45 |
| | ABS-BALANCE DEBIT | |
| | ZERO BAL TRANSFER DB 28864522 | -28,791.59 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/02 | ACH DEBIT 100013172 | -60,383.54 |
| | IRS        USATAXPYMT 220003363240131 | |
| | 3387702000CCI CONSTRUCTION CO 20000326405401 | |
| | SWEEP LOAN ADVANCE | 1,148,974.12 |
| | ABS-BALANCE CREDIT | |
| | ZERO BAL TRANSFER DB 28864522 | -12,508.41 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/03 | ACH CREDIT 100025567 | 905,785.54 |
| | AGRV TREAS 310  MISC PAY  251587897124000 | |
| | 3101036151CCI CONSTRUCTION CO 20000347192997 | |
| | SWEEP LOAN PAYMENT | -572,299.53 |
| | ABS-BALANCE DEBIT | |
| | ZERO BAL TRANSFER DB 28864522 | -416.22 |
| | ZBA TRANSFER TO   0028864522 | |
| 02/04 | ACH CREDIT 100020762 | 853,269.83 |
| | 36   TREAS 220  MISC PAY  251587897360012 | |
| | 3111036183C I CONST CO INC  20000357377916 | |
| | SWEEP LOAN PAYMENT | -109,375.10 |
| | ABS-BALANCE DEBIT | |
| | ZERO BAL TRANSFER DB 28864522 | -70,112.97 |
| | ZBA TRANSFER TO   0028864522 | |

Continued on back

00198317914869   050

Funds Transfers - continued

| Date | Description | Amount |
|------|-------------|--------|
| 02/07 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | $399,049.51 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -15,355.04 |
| 02/08 | SWEEP LOAN PAYMENT<br>ABS-BALANCE DEBIT | -217,078.14 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -17,039.37 |
| 02/09 | ACH CREDIT 100011006<br>PA TREASURY DEPT PAYROLL   000000000<br>1236003133CCI CONSTRUCTION CO 20000387941462 | 750.00 |
| | ACH DEBIT 100011008<br>IRS         USATAXPYMT 220004080406125<br>3387702000CCI CONSTRUCTION CO 20000398362715 | -51,671.20 |
| | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 103,619.93 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -9,176.79 |
| 02/10 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 32,392.97 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -6,028.39 |
| 02/11 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 1,301,826.10 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -69,638.68 |
| 02/14 | SWEEP LOAN ADVANCE<br>ABS-BALANCE CREDIT | 22,133.21 |
| | ZERO BAL TRANSFER DB 28864522<br>ZBA TRANSFER TO   0028864522 | -12,505.93 |
| 02/15 | SWEEP LOAN PAYMENT<br>ABS-BALANCE DEBIT | -242,960.14 |

Continued on next page



CCI CONSTRUCTION INC          Account Number          🕿 For assistance call
                              00288-6451-4               The Financial Center
                                                         1-800-220-6004

## Funds Transfers · continued

| Date | Description | Amount |
|------|-------------|--------|
| 02/15 | ZERO BAL TRANSFER DB 28864522 | -20,936.27 |
|  | ZBA TRANSFER TO  0028864522 |  |
| 02/16 | ACH DEBIT 100015211 | -51,390.43 |
|  | IRS          USATAXPYMT 2280047095670A4 |  |
|  | 3387702000CCI CONSTRUCTION CO 20000461020730 |  |
|  | ACH DEBIT 100015213 | -120.35 |
|  | IRS          USATAXPYMT 220004766633321 |  |
|  | 3387702000CCI CONSTRUCTION CO 20000471178710 |  |
|  | SWEEP LOAN PAYMENT | -62,060.29 |
|  | ABS-BALANCE DEBIT |  |
|  | ZERO BAL TRANSFER DB 28864522 | -6,948.97 |
|  | ZBA TRANSFER TO  0028864522 |  |
| 02/17 | SWEEP LOAN ADVANCE | 152,360.75 |
|  | ABS-BALANCE CREDIT |  |
|  | ZERO BAL TRANSFER DB 28864522 | -1,985.06 |
|  | ZBA TRANSFER TO  0028864522 |  |
| 02/18 | ACH CREDIT 100021220 | 2,796.72 |
|  | PA TREASURY DEPT PENNDOT   000000000 |  |
|  | 1236003133CCI CONSTRUCTION CO.20000471672591 |  |
|  | SWEEP LOAN ADVANCE | 197,885.64 |
|  | ABS-BALANCE CREDIT |  |
|  | ZERO BAL TRANSFER DB 28864522 | -66,731.24 |
|  | ZBA TRANSFER TO  0028864522 |  |

| 02/22 | ▮▮▮▮▮▮▮▮▮▮▮ | Total payment recieved  —  ▮▮▮▮▮▮▮ |
|  | AGRV TREAS  310  MISC PAY   251587897124000 |  |
|  | 3101036151CCI CONSTRUCTION CO.20000512267792 |  |
|  | ▮▮▮▮▮▮▮▮▮▮▮ | Net amount at end  — ▮▮▮▮▮▮ |
|  | ABS-BALANCE DEBIT | of day, after paying |
|  |  | checks and transfer to |
|  |  | CCI payroll account. |
|  |  | Applied to line of credit |
|  |  | balance. |

Continued on back

## Funds Transfers - continued

| Date | Description | | Amount |
|------|-------------|---|--------|
| 02/22 | ZERO BAL TRANSFER DB 28864522 – | Transfer to CCI payroll account to cover checks | -10,035.35 |
| | ZBA TRANSFER TO 0028864522 –   CCI Payroll Account | | |
| 02/23 | **ACH DEBIT** 100014538 | Attempt to transfer funds to IRS | -51,035.91 |
| | IRS   **USATAXPYMT** 220005426900881 | | |
| | 3387702000CCI CONSTRUCTION CO 20000532778926 | | |
| | ZERO BAL TRANSFER DB 28864522 | Transfer of funds to CCI payroll account to cover checks | -21,042.22 |
| | ZBA TRANSFER TO 0028864522 | | |
| 02/24 | ▆▆▆▆▆▆ | Challenged Payment | ▆▆▆▆▆ |
| | PA TREASURY DEPT PAYROLL   000000000 | | |
| | 1235003133CCI CONSTRUCTION CO 20000532869279 | | |
| | **ACH DEBIT REVERSAL-NSF** 410076706 - Rejection of IRS transfer for Non-Sufficient fund. | | 51,035.91 |
| | ZERO BAL TRANSFER DB 28864522 | Transfer of funds to CCI payroll account to cover checks | -8,759.03 |
| | ZBA TRANSFER TO 0028864522 | | |
| 02/25 | ▆▆▆▆▆▆ | Challenged Payment | ▆▆▆▆▆ |
| | COMMONWEALTH   EDIPAYMENT T0272412 | | |
| | 1546001745000BCCI CONSTRUCTION20000553608270 | | |
| | ZERO BAL TRANSFER DB 28864522 | Transfer of funds to CCI payroll account to cover checks | -65,817.54 |
| | ZBA TRANSFER TO 0028864522 . | | |
| 02/28 | ACH DEBIT 100013924 | | -1,167,539.00 |
| | COMMONWEALTH   REVERSAL T0272412 | Posting error | |
| | 1546001745000BCCI CONSTRUCTION20000593911056 | | |
| | ZERO BAL TRANSFER DB 28864522 | Transfer of funds to CCI payroll account to cover checks | -15,820.26 |
| | ZBA TRANSFER TO 0028864522 | | |
| 02/29 | ACH DEBIT REVERSAL-NSF 410028435 | Posting error | 1,167,539.00 |
| | ZERO BAL TRANSFER DB 28864522 | Transfer to CCI payroll account | -19,132.92 |
| | ZBA TRANSFER TO 0028864522 | | |

| Funds Transfers Total (net) | $5,260,757.03 |
|-----------------------------|---------------|

## Other Credits

| Date | Description | Amount |
|------|-------------|--------|
| 02/24 | CREDIT OVERRIDE 01257 - Represents advance on line to fund payroll account | $21,042.22 |
| | CREDIT FOR (42) RETURNED CHECKS ON ACCT. | |
| | 28864522 POSTED 02/ | |
| | 23/00. | |

Continued on next page

 allfirst

| | | |
|---|---|---|
| CCI CONSTRUCTION INC | Account Number<br>00288-6451-4 |  For assistance call<br>The Financial Center<br>1-800-220-6004 |

Other Credits - continued

| Date | Description | Amount |
|---|---|---|
| 02/24 | DEBIT REVERSAL - NSF 60155 410076707 | $25,307.10 |
| 02/24 | DEBIT REVERSAL - NSF 60369 410076708 | 18.45 |
| 02/24 | DEBIT REVERSAL - NSF 60372 410076709 | 8,330.28 |
| 02/24 | DEBIT REVERSAL - NSF 60460 410076710 | 111.48 |
| 02/24 | DEBIT REVERSAL - NSF 60473 410076711 | 68.90 |
| 02/24 | DEBIT REVERSAL - NSF 60518 410076712 | 76.27 |
| 02/24 | DEBIT REVERSAL - NSF 60542 410076713 | 38.16 |
| 02/24 | DEBIT REVERSAL - NSF 60580 410076714 | 176.40 |
| 02/24 | DEBIT REVERSAL - NSF 60624 410076715 | 65.00 |
| 02/24 | DEBIT REVERSAL - NSF 60644 410076716 | 4,855.50 |
| 02/24 | DEBIT REVERSAL - NSF 60669 410076717 | 16,300.00 |
| 02/24 | DEBIT REVERSAL - NSF 60670 410076718 | 16,976.34 |
| 02/24 | DEBIT REVERSAL - NSF 60676 410076719 | 45,323.62 |
| 02/24 | DEBIT REVERSAL - NSF 60756 410076720 | 199.35 |
| 02/24 | DEBIT REVERSAL - NSF 60768 410076721 | 15,625.27 |
| 02/24 | DEBIT REVERSAL - NSF 60784 410076722 | 1,112.01 |
| 02/25 | **CREDIT OVERRIDE 01745** - Represents advance on line to fund payroll account | 8,759.03 |
| | CREDIT FOR (16) RETURNED CHECKS POSTING | |
| | TO ACCT. 28864522 ON | |
| | 02/24/00. | |
| 02/25 | DEBIT REVERSAL - NSF 59492 410096098 | 137.27 |
| 02/25 | DEBIT REVERSAL - NSF 59572 410096099 | 144.20 |
| 02/25 | DEBIT REVERSAL - NSF 60253 410096100 | 478.01 |
| 02/25 | DEBIT REVERSAL - NSF 60262 410096101 | 5,818.82 |
| 02/25 | DEBIT REVERSAL - NSF 60311 410096102 | 502.20 |
| 02/25 | DEBIT REVERSAL - NSF 60327 410096103 | 534.57 |
| 02/25 | DEBIT REVERSAL - NSF 60331 410096104 | 603.13 |
| 02/25 | DEBIT REVERSAL - NSF 60391 410096105 | 67.25 |
| 02/25 | DEBIT REVERSAL - NSF 60419 410096106 | 234.41 |
| 02/25 | DEBIT REVERSAL - NSF 60490 410096107 | 2,000.00 |
| 02/25 | DEBIT REVERSAL - NSF 60491 410096108 | 2,829.75 |

Continued on back

608555
001 983 7914369

Other Credits - continued

| Data | Description | Amount |
|---|---|---|
| 02/25 | DEBIT REVERSAL - NSF 60557 410096109 | $95.91 |
| 02/25 | DEBIT REVERSAL - NSF 60564 410096110 | 102.10 |
| 02/25 | DEBIT REVERSAL - NSF 60588 410096111 | 214.62 |
| 02/25 | DEBIT REVERSAL - NSF 60634 410096112 | 1,380.00 |
| 02/25 | DEBIT REVERSAL - NSF 60635 410096113 | 39.68 |
| 02/25 | DEBIT REVERSAL - NSF 60636 410096114 | 6,900.00 |
| 02/25 | DEBIT REVERSAL - NSF 60637 410096115 | 7,869.60 |
| 02/25 | DEBIT REVERSAL - NSF 60665 410096116 | 1,485.66 |
| 02/25 | DEBIT REVERSAL - NSF 60694 410096117 | 2,940.00 |
| 02/25 | DEBIT REVERSAL - NSF 60716 410096118 | 203.16 |
| 02/25 | DEBIT REVERSAL - NSF 60719 410096119 | 1,645.35 |
| 02/25 | DEBIT REVERSAL - NSF 60720 410096120 | 182,733.35 |
| 02/25 | DEBIT REVERSAL - NSF 60721 410096121 | 23.85 |
| 02/25 | DEBIT REVERSAL - NSF 60723 410096122 | 833.44 |
| 02/25 | DEBIT REVERSAL - NSF 60724 410096123 | 245.87 |
| 02/25 | DEBIT REVERSAL - NSF 60725 410096124 | 38.90 |
| 02/25 | DEBIT REVERSAL - NSF 60726 410096125 | 22.29 |
| 02/25 | DEBIT REVERSAL - NSF 60727 410096126 | 780.71 |
| 02/25 | DEBIT REVERSAL - NSF 60728 410096127 | 105.84 |
| 02/25 | DEBIT REVERSAL - NSF 60729 410096128 | 464.81 |
| 02/25 | DEBIT REVERSAL - NSF 60730 410096129 | 30.00 |
| 02/25 | DEBIT REVERSAL - NSF 60731 410096130 | 149.09 |
| 02/25 | DEBIT REVERSAL - NSF 60733 410096131 | 116.13 |
| 02/25 | DEBIT REVERSAL - NSF 60734 410096132 | 101.13 |
| 02/25 | DEBIT REVERSAL - NSF 60735 410096133 | 209.34 |
| 02/25 | DEBIT REVERSAL - NSF 60736 410096134 | 842.14 |
| 02/25 | DEBIT REVERSAL - NSF 60737 410096135 | 532.06 |
| 02/25 | DEBIT REVERSAL - NSF 60739 410096136 | 309.53 |
| 02/25 | DEBIT REVERSAL - NSF 60740 410096137 | 33.04 |
| 02/25 | DEBIT REVERSAL - NSF 60744 410096138 | 12,347.31 |
| 02/25 | DEBIT REVERSAL - NSF 60755 410096139 | 1,626.39 |
| 02/25 | DEBIT REVERSAL - NSF 60757 410096140 | 35,000.00 |
| 02/25 | DEBIT REVERSAL - NSF 60775 410096141 | 1,456.48 |
| 02/25 | DEBIT REVERSAL - NSF 60793 410096142 | 260.23 |
| 02/25 | DEBIT REVERSAL - NSF 60823 410096143 | 475.30 |

Continued on next page

allfirst

CCI CONSTRUCTION INC

Account Number
00288-6451-4

For assistance call
The Financial Center
1-800-220-6004

**Other Credits - continued**

| Date | Description | Amount |
|------|-------------|-------:|
| 02/25 | DEBIT REVERSAL - NSF 60829 410096144 | $15.31 |
| **02/28** | **CREDIT OVERRIDE 02793** - Represents advance on line to fund payroll account | 4,172.22 |
| | CREDIT FOR (09) RETURNED CHECKS POSTING | |
| | TO ACCT. 28864522 ON | |
| | 02/25/00. | |
| 02/28 | DEBIT REVERSAL - NSF 60023 410034917 | 3,610.00 |
| 02/28 | DEBIT REVERSAL - NSF 60363 410034918 | 147.65 |
| 02/28 | DEBIT REVERSAL - NSF 60657 410034919 | 17,100.00 |
| 02/28 | DEBIT REVERSAL - NSF 60674 410034920 | 50.00 |
| 02/28 | DEBIT REVERSAL - NSF 60676 410034921 | 45,323.62 |
| 02/28 | DEBIT REVERSAL - NSF 60684 410034922 | 25,110.00 |
| 02/28 | DEBIT REVERSAL - NSF 60685 410034923 | 201.36 |
| 02/28 | DEBIT REVERSAL - NSF 60686 410034924 | 150.00 |
| 02/28 | DEBIT REVERSAL - NSF 60693 410034925 | 7,817.85 |
| 02/28 | DEBIT REVERSAL - NSF 60699 410034926 | 77.85 |
| 02/28 | DEBIT REVERSAL - NSF 60746 410034927 | 769.26 |
| 02/28 | DEBIT REVERSAL - NSF 60748 410034928 | 9,833.36 |
| 02/28 | DEBIT REVERSAL - NSF 60764 410034929 | 1,476.44 |
| 02/28 | DEBIT REVERSAL - NSF 60774 410034930 | 4,590.00 |
| 02/28 | DEBIT REVERSAL - NSF 60785 410034931 | 700.66 |
| 02/28 | DEBIT REVERSAL - NSF 60800 410034932 | 43,060.72 |
| 02/28 | DEBIT REVERSAL - NSF 60813 410034933 | 241.27 |
| 02/28 | DEBIT REVERSAL - NSF 60814 410034934 | 1,084.28 |
| 02/28 | DEBIT REVERSAL - NSF 60815 410034935 | 645.53 |
| 02/28 | DEBIT REVERSAL - NSF 60817 410034936 | 32.55 |
| 02/28 | DEBIT REVERSAL - NSF 60830 410034937 | 540.00 |
| **02/29** | **CREDIT OVERRIDE 01312** - Represents advance on line to fund payroll account | 15,820.26 |
| | CREDIT FOR (34) RETURNED CHECKS POSTING | |
| | TO ACCOUNT #28864522 | |
| | ON 02/28/00. | |
| 02/29 | DEBIT REVERSAL - NSF 60223 410033437 | 7,885.08 |

Continued on back

808523
001 3 317914869   C50

Other Credits - continued

| Date | Description | Amount |
|------|-------------|--------|
| 02/29 | DEBIT REVERSAL - NSF 60372 410028438 | $8,330.28 |
| 02/29 | DEBIT REVERSAL - NSF 60442 410028439 | 13.04 |
| 02/29 | DEBIT REVERSAL - NSF 60502 410028440 | 73.19 |
| 02/29 | DEBIT REVERSAL - NSF 60646 410028441 | 3,965.65 |
| 02/29 | DEBIT REVERSAL - NSF 60660 410028442 | 104.16 |
| 02/29 | DEBIT REVERSAL - NSF 60664 410028443 | 445.01 |
| 02/29 | DEBIT REVERSAL - NSF 60665 410028444 | 1,486.66 |
| 02/29 | DEBIT REVERSAL - NSF 60673 410028445 | 2,002.00 |
| 02/29 | DEBIT REVERSAL - NSF 60678 410028446 | 65.00 |
| 02/29 | DEBIT REVERSAL - NSF 60681 410028447 | 14,528.47 |
| 02/29 | DEBIT REVERSAL - NSF 60690 410028448 | 9,090.00 |
| 02/29 | DEBIT REVERSAL - NSF 60695 410028449 | 58.81 |
| 02/29 | DEBIT REVERSAL - NSF 60696 410028450 | 23.20 |
| 02/29 | DEBIT REVERSAL - NSF 60707 410028451 | 2,703.00 |
| 02/29 | DEBIT REVERSAL - NSF 60708 410028452 | 1,076.41 |
| 02/29 | DEBIT REVERSAL - NSF 60710 410028453 | 37,800.00 |
| 02/29 | DEBIT REVERSAL - NSF 60711 410028454 | 3,947.25 |
| 02/29 | DEBIT REVERSAL - NSF 60712 410028455 | 8,064.27 |
| 02/29 | DEBIT REVERSAL - NSF 60742 410028456 | 133.27 |
| 02/29 | DEBIT REVERSAL - NSF 60750 410028457 | 9,648.00 |
| 02/29 | DEBIT REVERSAL - NSF 60754 410028458 | 133.16 |
| 02/29 | DEBIT REVERSAL - NSF 60760 410028459 | 172.50 |
| 02/29 | DEBIT REVERSAL - NSF 60761 410028460 | 11,874.49 |
| 02/29 | DEBIT REVERSAL - NSF 60772 410028461 | 225.01 |
| 02/29 | DEBIT REVERSAL - NSF 60773 410028462 | 242.63 |
| 02/29 | DEBIT REVERSAL - NSF 60777 410028463 | 60.00 |
| 02/29 | DEBIT REVERSAL - NSF 60778 410028464 | 68.39 |
| 02/29 | DEBIT REVERSAL - NSF 60780 410028465 | 85.00 |
| 02/29 | DEBIT REVERSAL - NSF 60781 410028466 | 46.16 |
| 02/29 | DEBIT REVERSAL - NSF 60782 410028467 | 5,113.00 |
| 02/29 | DEBIT REVERSAL - NSF 60783 410028468 | 310.24 |
| 02/29 | DEBIT REVERSAL - NSF 60794 410028469 | 267.14 |
| 02/29 | DEBIT REVERSAL - NSF 60796 410028470 | 1,380.36 |
| 02/29 | DEBIT REVERSAL - NSF 60799 410028471 | 154.00 |
| 02/29 | DEBIT REVERSAL - NSF 60801 410028472 | 37.50 |

Continued on next page



CCI CONSTRUCTION INC

Account Number
00288-6451-4

For assistance call
The Financial Center
*1-800-220-6004*

## Other Credits - continued

| Date | Description | Amount |
|------|-------------|-------:|
| 02/29 | DEBIT REVERSAL - NSF 60802 410028473 | $82.50 |
| 02/29 | DEBIT REVERSAL - NSF 60803 410028474 | 37.50 |
| 02/29 | DEBIT REVERSAL - NSF 60804 410028475 | 199.50 |
| 02/29 | DEBIT REVERSAL - NSF 60805 410028476 | 199.50 |
| 02/29 | DEBIT REVERSAL - NSF 60806 410028477 | 37.50 |
| 02/29 | DEBIT REVERSAL - NSF 60807 410028478 | 82.50 |
| 02/29 | DEBIT REVERSAL - NSF 60808 410028479 | 283.50 |
| 02/29 | DEBIT REVERSAL - NSF 60819 410028480 | 41.15 |
| **Other Credits Total** | | **$754,545.47** |

## Other Debits

| Date | Description | Amount |
|------|-------------|-------:|
| 02/15 | DEBIT MEMO 023474261 — Unrelated transaction before Allfirst learned of CCI financial difficulty | -866.66 |
| 02/18 | ANALYSIS FEE 430002855 | -146.27 |
| **02/24** | ███████████ ⎤ Applying the 2/24 and 2/25 ACH transfers | ██████████ |
| **02/25** | ███████████ ⎦ to line of credit | ██████████ |
| **Other Debits Total** | | **-1,807,463.58** |

## End of Day Ledger Balance
Account balances are updated in the section below only on days when transactions posted to this account.

| Date | Balance | Date | Balance | Date | Balance |
|------|--------:|------|--------:|------|--------:|
| 01/31 | $323,137.00 | 02/09 | .00 | 02/18 | .00 |
| 02/01 | 53,600.00 | 02/10 | .00 | 02/22 | .00 |
| 02/02 | .00 | 02/11 | .00 | 02/23 | -195,215.30 |
| 02/03 | .00 | 02/14 | 359,995.00 | 02/24 | -272,341.30 |
| 02/04 | .00 | 02/15 | 482,605.00 | 02/25 | -216,932.98 |
| 02/07 | 356,193.00 | 02/16 | 22,273.00 | 02/28 | -1,366,133.60 |
| 02/08 | 1,425.00 | 02/17 | 4,400.00 | 02/29 | -184,963.71 |

Average daily ledger balance          -46,616.06



**FedEx**  Ship | **Track/History** | Address Book | Preferences | Fast Ship | Reports | My Profile

**?** Quick help

<< Log out | Home

Your Shipment Details:

| | | | |
|---|---|---|---|
| **Ship to:** | Honorable John J. Thomas U.S. Bkry.Ct., Middle Dist. PA 150 Max Rosenn U.S. Courthouse 197 South Main Street Wilkes-Barre, PA 18701 US 570-826-6450 | **Package Type:** **Pickup/Drop Off:** **Weight:** **Dimensions:** **Declared Value:** **Shipper Account Number:** **Bill Shipment To:** **Courtesy Rate Quote** **Shipment Type:** | FedEx Envelope give to scheduled courier at my location 1 LBS 0 x 0 x 0 0 USD 21231720 21231720 *10.41 Express |
| **From:** | cindy laudani GEBHARDT & SMITH LLP 401 E. PRATT STREET, 9TH FLOOR BALTIMORE, MD 21202 US 4103855033 | | |
| **Tracking no:** | 792270288201 | | |
| **Your reference:** | 18610 ljg | | |
| **Ship date:** | May 02 2005 | | |
| **Service Type:** | Priority Overnight | | |

Print

Return to next steps

**Please Note**

. *The courtesy rate shown here may be different than the actual charges for your shipment. Differences may occur based on actual weight, dimensions, and other factors. Consult the applicable <u>FedEx Service Guide</u> or the FedEx Rate Sheets for details on how shipping charges are calculated.

FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $500, e.g., jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits; Consult the applicable FedEx Service Guide for details.